**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 18 2000**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

RANDA SAFFO,

      Defendant-Appellant.

No. 99-6276

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CR-98-80-R)**

John W. Coyle, III (Catherine M. Burton with him on the brief), Oklahoma City, Oklahoma, for Defendant-Appellant.

Mary M. Smith, Assistant United States Attorney (Daniel G. Webber, Jr., United States Attorney, with her on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

Before **EBEL**, **ANDERSON**, and **MURPHY**, Circuit Judges.

**EBEL**, Circuit Judge.

On May 20, 1998, the Grand Jury for the Western District of Oklahoma charged defendant Randa Saffo and four others, Suhail Saffo, Nouhad Rached "Nick" El-Hajjaoui, Richard Kevin Day, and Mohammed Abdul Majid, in a

twenty-nine count indictment. The charges stemmed from an elaborate conspiracy of possessing and distributing pseudoephedrine[1] in violation of 21 U.S.C. § 841(d)(2), and engaging in money laundering transactions related to the pseudoephedrine distributions. After a seven-day jury trial, Saffo was convicted on all counts against her. She was sentenced to terms of imprisonment of 121 months and 120 months, to run concurrently, as well as a three-year period of supervised release, a special assessment of $1,000, and a fine of $100,000. She appeals, raising five issues. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## BACKGROUND

In August 1997, agents from the Drug Enforcement Administration (DEA) received a tip that Verdi Wholesale, a Las Vegas business, was having pseudoephedrine delivered to Las Vegas and then transported to California for the manufacture of methamphetamine. Surveillance led to agents following a van, which was being driven by David Verdi, after it picked up forty cases of pseudoephedrine in Las Vegas. Agents stopped the van when it crossed the

---

[1]Pseudoephedrine is a chemical substance found in many over-the-counter sinus medications; however the chemical can also be used to manufacture methamphetamine, an illegal substance. Because of its potential misuse, pseudoephedrine is a listed chemical under the Controlled Substances Act. See 21 U.S.C. § 802(34)(K). It is legal to possess and sell pseudoephedrine, provided that the appropriate license is obtained from the DEA, and applicable regulations are followed.

California state line.[2]  Inside the van, the agents found forty cases of pseudoephedrine, a shoe box with $24,965 in cash, checkbooks in five different business names and two different personal checking account names, and $165,000 in cashier checks.  The agents also found the following:  a small green spiral notebook that had the home, work, fax, and cellular telephone numbers of Randa Saffo ("Saffo") in Oklahoma City; Saffo's address in Oklahoma City under the heading "Noble Idea"; Federal Express receipts showing deliveries from David Verdi to Saffo in Oklahoma City and to Marcia Peterson at a company called Green Arrow Internationals, Inc. ("Green Arrow") in Las Vegas, Nevada; and a receipt for a cashier's check from Verdi Wholesale to "Noble Idea" in the amount of $7,000 drawn on Upland Bank, Upland, California.

DEA agents went to Green Arrow in Las Vegas and interviewed Nouhad Rached "Nick" El-Hajjaoui ("El-Hajjaoui"), who owned Green Arrow, and his assistant Marcia Peterson.  At the meeting, DEA agents learned that David Verdi of Verdi Wholesale was ordering pseudoephedrine through Green Arrow.  They also learned that Verdi was using two other companies, MA Distributing and 4-BBB, to order pseudoephedrine from Green Arrow.  The agents explained to El-Hajjaoui and Peterson what they knew about Verdi's involvement, and El-

---

[2]California state law prohibits the importation of pseudoephedrine without notice and a 21-day waiting period.  See Cal. Health & Safety Code § 11100(d) (West 2000).

Hajjaoui stated that he would no longer do business with Verdi through Verdi Wholesale or his other businesses. At this time, El-Hajjaoui and Peterson knew that pseudoephedrine could be illegally converted into methamphetamine. They had seen a DEA "Red Notice" form that contained warnings about illegal use of pseudoephedrine.

On August 14, 1997, DEA agents seized a second shipment of pseudoephedrine belonging to Verdi. Novel Ideas, a company in Sapulpa, Oklahoma, had sold this pseudoephedrine to Verdi. After the first stop of Verdi in August 1997, Green Arrow had begun doing business with Randa Saffo and Kevin Day, the owner of Novel Ideas. El-Hajjaoui made the initial contact with them and subsequently advised Peterson that he had obtained two new distributors, Novel Ideas and a company called Pamela's, which was also located in Oklahoma and was connected with Randa Saffo.[3] When El-Hajjaoui and Peterson flew out to Oklahoma to inspect their new distributors, Peterson learned

---

[3]Pamela's was owned by Marvin and Pamela Lathan. The company sold skin care products. Saffo became acquainted with the Lathans and asked them to assist her in what she referred to as her wholesale drug business. Initially, they assisted her in packing boxes of pseudoephedrine into larger boxes, then Saffo worked out an arrangement with the Lathans whereby their business name, Pamela's, and their business accounts were used for many of Saffo's pseudoephedrine orders. Saffo told Marvin Lathan that this was necessary because her company had not been in business for two years, thus she could not apply for the DEA license required to distribute pseudoephedrine legally. Saffo filled out an application for such a license for the Lathans, had Marvin Lathan sign it, and then sent it to the DEA for him.

that Pamela's and Novel Ideas' only customer for pseudoephedrine was Randa Saffo's company, Best Buy.

In September 1997, after Peterson requested that Novel Ideas and Pamela's send her their customer lists, Pamela's faxed Peterson a customer list that included the following companies: Associated Grocers in Tucson, Arizona; Arizona Produce Co. in Gilbert, Arizona; Bingo Cash and Carry in Phoenix, Arizona; and Arizona Trading in Phoenix, Arizona. After attempting to contact the purported customers, Peterson discovered the companies were either non-existent or did not sell pseudoephedrine. Peterson told El-Hajjaoui that the customer list was bogus and that she was going to stop the order. El-Hajjaoui got angry and told her to place the order. The next day, El-Hajjaoui said to Peterson, "How much of this do you think is going out on the street? . . . Seventy to 75 percent of it is going out on the street. And you need to know it, if you can live with that or not."[4] Peterson told El-Hajjaoui she could not live with that, and their business relationship ended. Peterson then went to the DEA and began cooperating with them.

El-Hajjaoui continued to purchase pseudoephedrine for Saffo for distribution to the purported customers. In March 1998, El-Hajjaoui discovered

---

[4]Peterson testified that she understood the phrase "going to the street" to mean drugs.

that Peterson had withdrawn Green Arrow's application for a license from the DEA to distribute pseudoephedrine legally. Shortly thereafter, El-Hajjaoui telephoned Marvin Lathan, one of the owners of Pamela's, and asked Lathan to order pseudoephedrine for him until he could get his DEA license. He offered Lathan a fee of $15,000 a week. The following day, in a telephone call recorded by the DEA with Lathan's consent, Lathan and El-Hajjaoui discussed the proposed business arrangement. After the telephone conversation, Lathan received faxed documents from El-Hajjaoui showing that El-Hajjaoui's purported customers were M.A. Distributing, Mohammed Majid, and 4-BBB. These were company names used by David Verdi, but investigation revealed that the companies did not exist or used the same address.

The arrangement between Saffo, the Lathans, and Green Arrow was as follows: Saffo would tell Marvin Lathan the amount of pseudoephedrine to order; Lathan would fax an order to Green Arrow in Las Vegas; and Green Arrow would order the pseudoephedrine from a manufacturer in New York and direct a shipment to Pamela's in Oklahoma City. From Pamela's the shipment was supposed to be picked up by representatives of the purported Arizona business customers in rental trucks. Saffo received payment for the pseudoephedrine in cash, in Federal Express envelopes. When Marvin Lathan refused to accept cash for the transactions, Saffo gave him cashier's checks. Marvin Lathan deposited

the cashier's checks in Pamela's business account at Charter Bank in Oklahoma City. Marvin Lathan would then wire transfer funds from the Charter Bank account to the Las Vegas bank account of Green Arrow for payment of the pseudoephedrine. Saffo directed that her name be kept off all the purchase orders, and that paperwork on the pseudoephedrine purchases should be destroyed.

Randa Saffo and El-Hajjaoui provided Marvin Lathan with copies of the business licenses of the purported Arizona customers. None of these were real customers.

Randa Saffo rented self storage units in the Oklahoma City area under fictitious names or the names of others. She used the storage units to store pseudoephedrine shipped to Pamela's. At Saffo's direction, Marvin Lathan and his daughter-in-law tore labels off the boxes of pseudoephedrine and repacked the pseudoephedrine into larger boxes before it was loaded into the rental trucks.

On December 15, 1997, Pamela Lathan met with Saffo. DEA agents monitored and videotaped the meeting. During the meeting, Pamela Lathan showed Saffo a DEA "Red Notice," which advised that criminals use bulk pseudoephedrine and pseudoephedrine products to manufacture methamphetamine. Saffo discussed the notice with Pamela Lathan and assured her that the pseudoephedrine was going to Arizona.

In addition to the pseudoephedrine Saffo was ordering through the Lathans' business, Saffo was receiving large quantities of pseudoephedrine from Kevin Day's company, Novel Ideas. Brian Miller, an employee of Novel Ideas, drove shipments of pseudoephedrine to Saffo's residence, her beauty shop, and the self storage units. Kevin Day accompanied Miller on at least one of the deliveries. During one two-month period, the shipments amounted to approximately 360 cases of pseudoephedrine per week.

Saffo paid for the Novel Ideas pseudoephedrine in cash. On one occasion, Miller had to wait for Saffo to receive a Federal Express delivery so that she could pay him for the shipment. Miller transported over $250,000 in cash on two occasions, and he estimated that he carried approximately $800,000 in cash during the eight to ten-month period he was transporting the money.

Day and Saffo's purported customers were the same Arizona companies as the Lathan sales. In late summer or early fall of 1997, Miller attempted to contact the companies to see if they wanted to purchase some pseudoephedrine from a recent shipment. Miller was only able to reach one of the companies, and was told that pseudoephedrine was not a product the company used in its business. Miller told Kevin Day of his attempt to contact the companies, and also told him that he thought something was not right. Novel Ideas continued to sell pseudoephedrine to Saffo's purported Arizona customers after that date.

Day had applied for his licence to distribute in May 1997. In June 1997, the DEA interviewed Day as part of the preregistration process, and informed him that pseudoephedrine could be used to manufacture methamphetamine. The DEA asked Day to supply a list of his pseudoephedrine customers. The list produced by Day did not contain the names of Randa Saffo or her companies, although Day had been selling pseudoephedrine to her since March 1997.

In September 1997, Day contacted the DEA to report suspicious activity of an individual named David Verdi. In January 1998, Day called the DEA to report what he termed a suspicious call from a person wanting to buy pseudoephedrine. When the DEA returned his call to get more information, Day stated that the person who contacted him, Mohammed, wanted to send cash through the mail for the purchase, which he termed "strange." He also told the DEA that Mohammed wanted to purchase 120 cases of pseudoephedrine, and that that was "unusual." Day told the DEA that he rejected the sale, telling the customer, "No, that's not the way we work things."

In March 1998, Day received a phone call from a California police officer who informed Day that 1,000 empty pseudoephedrine bottles sold by Day had been found in California. Day called the DEA in Oklahoma City regarding this telephone call. The DEA asked Day to submit a response in writing to the DEA regarding this event. Day faxed a letter to the DEA, specifying his customers for

the lot numbers of empty bottles of pseudoephedrine found in California. The letter identified the customers as Bingo Cash & Carry in Phoenix, Arizona and Arizona Trading in Bullhead City, Arizona. It did not mention Randa Saffo. The letter also said that "Novel Ideas had been selling to Bingo Cash & Carry for over a year with no reported problems." At that time, Bingo Cash & Carry had not been in existence for six years.

On March 17, 1998, DEA investigators met with Day and his attorney. At that meeting, Day presented documentation regarding his purported customers. This included purported applications to the DEA for licenses to sell pseudoephedrine from the four nonexistent Arizona companies, copies of money orders and registered mail receipts which supposedly accompanied each of the applications, and the purported city licences for the four Arizona companies. Day admitted that he had been selling pseudoephedrine to Randa Saffo for almost two years.

In April 1998, DEA investigators interviewed Saffo ostensibly about her DEA 510 application to handle pseudoephedrine. Saffo told the investigators she had been a broker for Kevin Day for six or seven months during 1997. Saffo stated she had only one customer for pseudoephedrine sales, a customer in Las Vegas whose name she could not recall. Later in the interview, Saffo recalled another customer, Cash and Carry in Arizona. When shown the same DEA "Red

Notice" she had been shown on December 15, 1997 by Pamela Lathan, Saffo stated she had never seen one before.

In May 1998, agents executed search warrants at Saffo's business and residence and at Kevin Day's business. At Day's business in Sapulpa, agents found a bank bag labeled "Randa" containing the key to the Oklahoma City self-storage unit rented by Saffo in the fictitious name "Brenda Iskandar" and directions to locate it. Agents also found the following: a "Distributor Conditions of Sales Contract for OTC Drug Products Containing List I Chemicals," apparently signed by Saffo, that prohibited cash sales and drop shipments and contained a notation that the form should be returned by November 20, 1996; a steno notebook that contained a listing of the purported Arizona businesses; records David Verdi had sent to Kevin Day on August 19, 1997 regarding Verdi's company; documents showing Green Arrow and Novel Ideas' purchases and shipments of pseudoephedrine; and invoices reflecting pseudoephedrine distribution to the purported Arizona customers.

Agents seized over 840 cases of pseudoephedrine in California in October 1997 from a duplex used for storage and sales of pseudoephedrine for methamphetamine manufacturers. Most of the cases were filled with the Green Arrow brand and the Ephrin release brand of pseudoephedrine and were traced to shipments from Pamela's or Novel Ideas.

During 1997, Saffo, El-Hajjaoui, and Day sold 197,883,552 sixty milligram tablets of pseudoephedrine. From January through April 1998, they sold 38,454,366 sixty milligram tablets. By comparison, for the same time period in 1997, Warner Lambert Company sold 38 million 60 milligram caplets of Sudafed brand pseudoephedrine nationwide, and only four million 60 milligram caplets in the State of California.

Saffo, El-Hajjaoui, and Day realized significant income from the sale of pseudoephedrine. There was substantial evidence of Saffo, El-Hajjaoui, and Day's involvement in numerous financial transactions through various bank accounts, as well as substantial evidence of phone calls between them, and between Saffo and David Verdi during the relevant period.

Saffo was convicted of one count of conspiracy to possess and distribute pseudoephedrine in violation of 21 U.S.C. § 841(d)(2) and § 846, seven counts of distribution of pseudoephedrine in violation of 21 U.S.C. § 841(d)(2) and 18 U.S.C. § 2, three counts of structuring monetary transactions to avoid reporting requirements in violation of 31 U.S.C. §§ 5324(a)(3), 5322(b), two counts of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), and eleven counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 2.

On appeal, Saffo challenges the constitutionality of 21 U.S.C. § 841(d)(2), one of the statutes under which she was convicted, on the grounds that (1) it permits an individual to be convicted without the requisite mens rea, and (2) its use of the "reasonable cause to believe" standard renders it unconstitutionally vague. Saffo also argues that the district court erred in refusing to grant her a downward departure from the money laundering guideline range, refusing to grant her a two-level sentence reduction for acceptance of responsibility, and refusing to grant her a two-level "safety-valve" sentence reduction.

## II. DISCUSSION

A.  Constitutionality of 21 U.S.C. § 841(d)(2)[5]

We review de novo questions regarding a statute's constitutionality. See United States v. Hampshire, 95 F.3d 999, 1001 (10th Cir. 1996).

---

[5]Constitutional challenges to a statute's lack of a mens rea requirement and its vagueness are closely related. See Colautti v. Franklin, 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (1979); see also United States v. Cordoba-Hincapie, 825 F. Supp. 485, 513 (E.D. N.Y. 1993) (stating that in both cases, "the constitutional aversion is to capturing the unwitting person who did not seek to violate the law."). Because of subtle differences in the analysis of the two questions, however, we treat these issues separately.

1.  <u>Whether the Statute Permits Conviction Without the Requisite Mens Rea</u>

The relevant language of 21 U.S.C. § 841(d)(2) (1999)[6] provides:

> (d) Offenses involving listed chemicals
>    Any person who knowingly or intentionally -
>        (2) possesses or distributes a listed chemical *knowing, or having reasonable cause to believe*, that the listed chemical will be used to manufacture a controlled substance . . . shall be fined in accordance with Title 18 or imprisoned not more than 20 years . . . .

21 U.S.C. § 841(d)(2) (emphasis added). The first question raised by Saffo is whether the alternative "reasonable cause to believe" mental state in § 841(d)(2) is constitutionally sufficient to impose criminal liability. We hold that it is.

"The existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." <u>Dennis v. United States</u>, 341 U.S. 494, 500, 71 S.Ct. 857, 862, 95 L.Ed. 1137 (1951); <u>see also</u> <u>Morissette v. United States</u>, 342 U.S. 246, 250-51, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952). Congress has the authority to define the mens rea it deems appropriate for a specific crime. <u>See</u> <u>United States v. McArthur</u>, 108 F.3d 1350, 1354 n.8 (11th Cir. 1997) (citing <u>Staples v. United States</u>, 511 U.S. 600, 603-06, 114 S.Ct. 1793, 1796-97, 128 L.Ed.2d 608 (1994)); <u>see also</u> <u>Liparota v. United States</u>, 471 U.S. 419, 424, 105 S.Ct. 2084, 2087, 85 L.Ed.2d 434 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the

---

[6]This provision is now listed at 21 U.S.C. § 841(c)(2) (2000).

case of federal crimes, which are solely creatures of statute."). We should "avoid construing a statute to dispense with mens rea where doing so would 'criminalize a broad range of apparently innocent conduct.'" Staples, 511 U.S. at 610 (citing Liparota, 471 U.S. at 426).

The scienter standard of "knowing or having reasonable cause to believe" or one essentially identical to it is present in numerous federal statutes, many of which, like § 841(d)(2), impose felony punishments for violations. See e.g., 21 U.S.C. § 960(d)(3) (importing or exporting listed chemicals "knowing or having reasonable cause to believe" that the chemical will be used to manufacture a controlled substance); 18 U.S.C. § 842(h) (possessing, transporting, or selling explosive materials "knowing or having reasonable cause to believe" that the explosive materials were stolen); 18 U.S.C. § 922(d) (selling or otherwise disposing of any firearm or ammunition to any person "knowing or having reasonable cause to believe" that such person meets one of nine criteria); 18 U.S.C. § 231(a)(1) (teaching or demonstrating to another the use, application, or making of any firearm or explosive or incendiary device "knowing or having reason to know or intending" that it will be unlawfully employed for use in, or in furtherance of, a civil disorder that may obstruct, delay, or adversely affect commerce); 18 U.S.C. § 231(a)(2) (transporting or manufacturing for transportation in commerce any firearm, or explosive or incendiary device

- 15 -

"knowing or having reason to know or intending" that it will be used unlawfully in furtherance of a civil disorder"); 18 U.S.C. § 1546(b) (using an identification document "knowing (or having reason to know)" that the document was not issued lawfully for the use of the possessor or is false); 18 U.S.C. § 2512(1) (manufacturing, distributing, possessing, and advertising devices for the surreptitious interception of communications "knowing or having reason to know" that the design of the device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications).

Standards such as these have been described as imposing a sufficient mens rea requirement on a number of occasions. For example, in Gorin v. United States, 312 U.S. 19, 27-28, 61 S.Ct. 429, 433-34, 85 L.Ed. 488 (1941), the Supreme Court responded to a vagueness challenge to the Espionage Act, which used a scienter standard of "intent or reason to believe [that the information is to be used to the injury of the United States,]" by stating: "The obvious delimiting words in the statute are those requiring 'intent or reason to believe . . . .' This requires those prosecuted to have acted in bad faith. The sanctions apply only when scienter is established." See also United States v. Wuliger, 981 F.2d 1497, 1504 (6th Cir. 1992) (upholding the "reason to know" standard of 18 U.S.C. § 2511(1)(d) as a "constitutionally sufficient basis for criminal liability"); United States v. Green, 779 F.2d 1313, 1318-19 (7th Cir. 1985) (rejecting defendant's

argument that the "knowing or having reasonable cause to believe" standard in 18 U.S.C. § 841(d)(2) sets up a standard of negligence or recklessness that is different from knowledge); United States v. Featherston, 461 F.2d 1119, 1121-1122 (5th Cir. 1972) (upholding "knowing or having reason to know" standard in 18 U.S.C. § 231(a)(1), and citing Gorin, 312 U.S. at 27-28); National Mobilization Comm. to End the War in Viet Nam v. Foran, 411 F.2d 934, 937 (7th Cir. 1969) (stating that the "knowing, or having reason to know or intending" language of 18 U.S.C. § 231(a)(1) is an intent requirement that "of course 'narrows the scope of the enactment by exempting innocent or inadvertent conduct from its proscription'" (citation omitted)).

In light of these authorities, we hold that the "knowing or having reasonable cause to believe" standard in 21 U.S.C. § 841(d)(2) imposes a constitutionally sufficient mens rea requirement. In so holding, we note that the standard involves a subjective inquiry that looks to whether the particular defendant accused of the crime knew or had reasonable cause to believe the listed chemical would be used to manufacture a controlled substance. This requires scienter to be evaluated through the lens of this particular defendant, rather than from the prospective of a hypothetical reasonable man. In this context, the "reasonable cause to believe" standard is one akin to actual knowledge. See State v. Smith, 123 A.2d 369, 64-65 (N.J. 1956) (stating, in the context of a discussion

- 17 -

of a statute's "reason to believe" standard, that "[k]nowledge within the meaning of law . . . may consist of credible information on material facts and circumstances sufficient in content and quality to generate a reasonable belief.") (citation omitted). The "reasonable cause to believe" standard thus comports with the subjective "guilty mind" or "guilty knowledge" requirement for imposing criminal liability. As further stated in Smith's discussion of a "reason to believe" statutory standard:

> Guilt is personal; the determinant here is the reasoned conviction of the mind of the accused, a subjective inquiry, not a theoretical, vicarious belief of the hypothetical reasonable man, as the State and the accused would have it, akin to the standard governing reparation in damages for the civil wrong occasioned by negligence.

Id. at 64; cf. Wuliger, 981 F.2d at 1504 (finding fault with the district court's "reasonable foreseeability" instruction instead of a "reason to know" standard, and stating that on retrial, the court should focus on *defendant's* reason to know rather than on whether it was generally reasonably foreseeable that the required circumstance would occur). Because Congress has included in 21 U.S.C. § 841(d)(2) the requisite mens rea element, we reject Saffo's first constitutional challenge to the statute.[7]

_____

[7]Our holding on this issue does not conflict with this court's prior ruling in Kansas Retail Trade Coop. v. Stephan, 695 F.2d 1343 (10th Cir. 1982). In Stephan, we upheld a "knowing or under circumstances where one reasonably should know" standard in part because the definitional section of the statute

(continued...)

Because we find a sufficient mental state requirement in 21 U.S.C. § 841(d)(2), Saffo has no valid challenge to the general verdict on the count of the indictment pertaining to that statute. See Schad v. Arizona, 501 U.S. 624, 632, 111 S.Ct. 2491, 2497, 115 L.Ed.2d 555 (1991) (holding that a jury could return a general verdict under alternative mental states). Moreover, we further note that in the case before us, the jury's conviction of Saffo on the money laundering counts under 18 U.S.C. § 1956 demonstrates that the jury necessarily found that Saffo had *actual knowledge* that the pseudoephedrine would be used to manufacture methamphetamine, not that he merely had "reasonable cause to

---

[7](...continued)
imposed an additional illegal intent requirement. The lack of such an additional illegal intent requirement from a definitional section in 21 U.S.C. § 841(d)(2) does not require us to find that statute unconstitutional. The standard at issue in Stephan, "knowing or under circumstances where one reasonably should know," Stephan, 695 F.2d at 1344-45, looks at what the defendant actually knows *or* what a *hypothetical reasonable person reasonably should know*, and thus it differs from the subjective standard in 21 U.S.C. § 841(d)(2) of what the particular defendant knew or had reasonable cause to believe. Moreover, the decision in Stephan to uphold the standard was not entirely based on the existence of a definitional section that imposed an additional illegal intent requirement; it also looked to the fact that other criminal statutes with the "reasonably should know" or similar standards had been upheld. See Stephan, 695 F.2d at 1346; see also Kansas Retail Trade Coop. v. Stephan, 522 F. Supp. 632, 639 (D. Kan. 1981), aff'd in part, rev'd in part, 695 F.2d 1343 (10th Cir. 1982) (relying on the fact that such standards have been upheld when challenged).
    Saffo's other citations to cases construing statutes that contained no mens rea requirement are not relevant to our analysis of this issue. The statute before us contains a mens rea requirement; it does not impose strict liability for a violation.

- 19 -

believe" it would be so used. A conviction under 18 U.S.C. § 1956(a)(1) requires a showing that the defendant engaged in certain financial transactions "<u>knowing</u> that the property involved in a financial transaction represents the proceeds of some form of unlawful activity . . . ." 18 U.S.C. § 1956(a)(1) (emphasis added). The fact that the jury convicted Saffo of money laundering means at the very least that it found Saffo actually knew that she had reasonable cause to believe that the pseudoephedrine would be used to manufacture methamphetamine under 21 U.S.C. § 841(d)(2).

2. <u>Whether 21 U.S.C. § 841(d)(2) is Unconstitutionally Vague</u>

"When reviewing a statute alleged to be vague, courts must indulge a presumption that it is constitutional, and the statute must be upheld unless the court is satisfied beyond all reasonable doubt that the legislature went beyond the confines of the Constitution." <u>Brecheisen v. Mondragon</u>, 833 F.2d 238, 241 (10th Cir. 1987).

Saffo argues that all of the charges against her depended on the government's assertion that Saffo had "reasonable cause to believe" the pseudoephedrine she sold would be used to manufacture methamphetamine, and that the standard of "reasonable cause to believe" that the chemical "will be used" for manufacturing a controlled substance renders the statute unconstitutionally

vague because it (1) offers no objective criteria by which a citizen may know, in advance, what conduct is legal and what conduct is not; (2) offers no objective criteria for enforcement by police; and (3) impermissibly affects a wide range of otherwise innocent conduct concerning the distribution of a legal product. Thus, according to Saffo, 21 U.S.C. § 841(d)(2) offers no ascertainable standard for determining which pseudoephedrine distributors are innocent and which are not.

"'[T]he void for vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" United States v. Corrow, 119 F.3d 796, 802 (10th Cir. 1997) (quoting Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed. 2d 903 (1983)). "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand. One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 n.7 (1982) (internal citations and quotations omitted); Corrow, 119 F.3d at 803.

We hold that the evidence produced at trial demonstrated that Saffo is "one to whose conduct [the] statute clearly applies"; therefore, she cannot successfully challenge the statute for vagueness. The record shows that Saffo was a key

participant in the entire scheme, and was not unaware of the illegal activities that were taking place. She took extensive steps to conceal her activities, including renting storage units in fake names, asking that her name be kept off all of the invoices, and using fictitious company licenses; she lied to the DEA about whether she had ever seen a DEA "Red Notice" and about her pseudoephedrine customers; she engaged in numerous cash transactions, handling millions of dollars in cash delivered to her in Federal Express envelopes; her name and telephone numbers were found on drivers stopped with large quantities of pseudoephedrine in California, where Saffo knew shipments could not be made without notice and a 21-day waiting period.

The evidence produced at trial demonstrates that Saffo had knowledge of the illegality of her activities, and thus this is not a situation where she "could not reasonably understand that [her] contemplated conduct is proscribed." Parker v. Levy, 417 U.S. 733, 757, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974) (quoting Unites States v. National Dairy Prods. Corp., 372 U.S. 29, 32-33, 83 S.Ct. 594, 598, 9 L.Ed.2d 561 (1963)). We conclude that, as applied to Saffo, the statute is not unconstitutionally vague.[8]

---

[8]We further add that even if the statute were otherwise vague, our finding, supra, that the statute contains a sufficient mens rea requirement, would mitigate that vagueness. See Village of Hoffman Estates, 455 U.S. at 499 ("[T]he Court has recognized that a scienter requirement may mitigate a law's vagueness,

(continued...)

- 22 -

B.     Downward Departure Because of Incidental Nature of Money Laundering
       Offenses

Saffo argues that the district court erred in refusing to grant her a

downward departure based on the fact that the money laundering offenses, which

resulted in a higher offense level than the other crimes for which she was

convicted, were incidental to the distribution of pseudoephedrine.  "Absent the

trial court's clear misunderstanding of its discretion to depart, or its imposition of

a sentence which violates the law or incorrectly applies the guidelines, we have

no jurisdiction to review a refusal to depart."  United States v. Coddington, 118

F.3d 1439, 1441 (10th Cir. 1997) (citations omitted).

At sentencing, the trial judge stated:  "I'm troubled by the length of the

sentence that is mandated, but I think the Court is constrained, and I don't think --

I am constrained by the law and I just don't feel a downward departure is

appropriate in this case."  He then went on to discuss the underlying drug and

_____

        [8](...continued)
especially with respect to the adequacy of notice to the complainant that his
conduct is proscribed."); see also United States v. Gaudreau, 860 F.2d 357, 360
(10th Cir. 1988) ("[A] scienter requirement may mitigate a criminal law's
vagueness by ensuring that it punishes only those who are aware their conduct is
unlawful.") (citing Screws v. United States, 325 U.S. 91, 101-04, 65 S.Ct. 1031,
1035-37, 89 L.Ed. 1495 (1945) (plurality opinion)); Wayne R. LaFave & Austin
W. Scott, Jr., Substantive Criminal Law § 2.3, at 130 (1986) ("Not infrequently
the Supreme Court, in passing upon a statute claimed to be unconstitutional for
vagueness, has concluded that the statute gives fair warning because scienter is an
element of the offense.") (citations omitted).

money laundering offenses, the "millions of dollars" that were laundered, and the fact that the money was used to further the business by buying more pseudoephedrine. He concluded by saying that "the sentence is lengthy but that's not within the Court's province to determine what the statute says on sentencing and I'm constrained by that, so I am going to deny the motion for a downward departure."

From these statements, we conclude that the judge understood that he had discretion to depart, but determined that departure was not warranted in this instance. The fact that he considered the sentence that was warranted under the guidelines to be lengthy does not demonstrate that he believed he could not depart from that sentence. In fact, his statement that he did not believe downward departure was appropriate here, and his discussion of characteristics of the offenses indicates precisely the opposite.

Because the trial court did not misunderstand its discretion to depart on this issue, did not impose a sentence that violates the law, and did not incorrectly apply the guidelines, we lack jurisdiction to review the district court's refusal to depart on this issue.

C.    Sentence Reduction for Acceptance of Responsibility

Saffo argues that she was entitled to a two-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 because she never denied the acts she

was charged with committing. "Determination of acceptance of responsibility is a question of fact reviewed under a clearly erroneous standard." United States v. Gauvin, 173 F.3d 798, 805 (10th Cir. 1999). "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1, commentary (n.5).

"To receive a sentence reduction for acceptance of responsibility, the defendant must show 'recognition and affirmative acceptance of personal responsibility for his criminal conduct.'" United States v. Mitchell, 113 F.3d 1528, 1534 (10th Cir. 1997) (quoting United States v. McAlpine, 32 F.3d 484, 489 (10th Cir. 1994)). The defendant has the burden of making this showing by a preponderance of the evidence. See id. The notes to the acceptance of responsibility provision in the sentencing guidelines state:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1, commentary (n.2).

Because Saffo put the government to its burden of proof at trial, the question for us is whether this is one of the "rare situations" in which a defendant may clearly demonstrate an acceptance of responsibility despite the fact that she went to trial. We hold that it was not.

Although Saffo did not deny that she committed the acts that occurred, she never admitted any culpability for those acts. At sentencing, she continued to deny affirmatively any guilt for the acts that she committed. She argued that she did not know or have reasonable cause to believe that the pseudoephedrine would be used to make methamphetamine, which amounts to an argument that she lacked the requisite intent. There is substantial evidence here that this defense was not asserted in good faith. The evidence indicating her actual knowledge of the intended use of the pseudoephedrine was substantial. See section II.A.2., supra. Moreover, the district court's finding that Saffo did not meet her burden is entitled to considerable deference.

This case is therefore easily distinguishable from Gauvin. In Gauvin, the defendant argued that his drunkenness rendered him incapable of forming the requisite mens rea. See Gauvin, 173 F.3d at 806. Although the jury disagreed with the defendant's argument, the district court found that his defense was made in good faith. It therefore gave the defendant a two-point acceptance of

responsibility reduction. We affirmed, stating that "[a]lthough we recognize that such adjustments are 'rare,' and might not have reached the same decision, in light of the deference afforded the sentencing judge, we hold the district court did not err in granting a downward departure for acceptance of responsibility." Id. (internal citation omitted).

Here, under the same principles used in Gauvin that looked to the good faith of the defendant's defense and afforded deference to the sentencing judge's determination on that issue, we hold that the district court did not err in denying Saffo a downward departure for acceptance of responsibility.

D.     "Safety Valve" Sentence Reduction

Saffo's final argument on appeal is that she should have received a sentence reduction under the safety valve provision of the sentencing guidelines, U.S.S.G. § 5C1.2, 18 U.S.C. § 3553(f), and its cross-reference in U.S.S.G. § 2D1.1. "We review the district court's determination of a particular defendant's eligibility for relief under § 3553(f) for clear error." United States v. Gonzalez-Montoya, 161 F.3d 643, 651 (10th Cir.1998) (citations omitted), cert. denied, 526 U.S. 1033 (1999). However, we review de novo the district court's interpretation of the sentencing guidelines. See United States v. Myers, 106 F.3d 936, 941 (10th Cir. 1997).

A defendant sentenced under U.S.S.G. § 2D1.1 who meets the five criteria listed in the safety valve provision of § 5C1.2 receives a two-level sentence reduction if her offense level is 26 or greater. See U.S.S.G. § 2D1.1(b)(6). The five criteria from § 5C1.2 include:

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
> (3) the offense did not result in death or serious bodily injury to any person;
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and
> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

U.S.S.G. § 5C1.2(1)-(5).

The government does not dispute that Saffo meets the five criteria; rather, the government argues that Saffo is not eligible for the two-level reduction in U.S.S.G. § 2D1.1 because she was sentenced under §§ 2D1.11 and 2S1.1, which do not provide for a two-level reduction if the criteria from § 5C1.2 are met. We

agree. A sentence under §§ 2D1.11 and 2S1.1 does not make Saffo eligible for the safety valve reduction under § 2D1.1.

We also reject Saffo's argument that she would fall within the cross reference to § 2D1.1 that appears in § 2D1.11. That cross reference states: "If the offense involved unlawfully manufacturing a controlled substance, or attempting to manufacture a controlled substance unlawfully, apply § 2D1.1 . . . if the resulting offense level is greater than that determined above." U.S.S.G. § 2D1.11(c)(1). Saffo's offense did not involve unlawfully manufacturing or attempting to manufacture a controlled substance unlawfully; therefore that provision cannot get her within § 2D1.1 and its reference to § 5C1.2.

Neither can Saffo claim that § 5C1.2 applies to her under a separate theory of that provision's general limitation on the applicability of statutory minimums in certain cases. The limitation mandates that "[i]n the case of an offense under 21 U.S.C. § 841, § 844, § 846, § 960, or § 963, the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence" if the defendant meets the five criteria. U.S.S.G. § 5C1.2.

Saffo was sentenced at an offense level of 32 because the money laundering conviction under 18 U.S.C. § 1956(h) provided the higher offense level. An offense under 21 U.S.C. § 1956(h) is not among those listed within § 5C1.2. Although she was also convicted of an offense under 21 U.S.C. § 841(d)(2),

which is listed in § 5C1.2, that offense does not carry a statutory minimum. See 21 U.S.C. § 841(d)(2). The cases cited by Saffo for the proposition that a reduction under § 5C1.2 can apply to offenses that do not carry a statutory minimum or offenses other than those enumerated are inapposite: they each involved sentences computed under § 2D1.1, not § 2D1.11. See United States v. Leonard, 157 F.3d 343, 346 (5th Cir. 1998); United States v. Osei, 107 F.3d 101, 102 (2d Cir. 1997); United States v. Mertilus, 111 F.3d 870, 874 (11th Cir. 1997). Thus, those cases concerned the cross reference in § 2D1.1(b)(6) to § 5C1.2; they were not discussing the general limitation in § 5C1.2 on the applicability of statutory minimums in certain cases. As stated above, Saffo cannot get the two level reduction from §2D1.1(b)(6) because she was not sentenced under § 2D1.1.

Therefore, we agree with the district court that Saffo was not eligible for a sentence reduction under § 2D1.1 and § 5C1.2.

### III. CONCLUSION

We hold that 21 U.S.C. § 841(d)(2) does not permit an individual to be convicted without the requisite mens rea, and we hold that it is not void for vagueness as applied to Saffo. We lack jurisdiction to review the district court's refusal to depart downward based on Saffo's argument that the money laundering offenses were incidental to the distribution of pseudoephedrine. We agree with

the district court that Saffo is not entitled to a downward adjustment for acceptance of responsibility or a reduction under the Sentencing Guidelines safety valve provisions. Therefore, we AFFIRM the conviction and sentence.