NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0503n.06
Filed: June 14, 2005

Case No. 02-4332

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,            )
                                     )
        Plaintiff-Appellee,          )
                                     )        ON APPEAL FROM THE
        v.                           )        UNITED STATES DISTRICT
                                     )        COURT FOR THE NORTHERN
RONALD MERKOSKY,                     )        DISTRICT OF OHIO
                                     )
        Defendant-Appellant.         )
                                     )
                                     )
                                     )
_____ )

BEFORE: BATCHELDER and MOORE, Circuit Judges; CALDWELL*, District Judge.

        ALICE M. BATCHELDER, Circuit Judge.  Defendant-Appellant Ronald Merkosky

appeals his conviction and sentence for possession with intent to distribute pseudoephedrine in

violation of 21 U.S.C. § 841(d)(2),[1] and furnishing false or fraudulent sales records in violation of

21 U.S.C. § 843(a)(4)(A).  Specifically, Merkosky asserts that the evidence presented at trial was

insufficient to sustain his convictions; the mens rea component of 21 U.S.C. § 841(d)(2) is

unconstitutional; the prosecutor engaged in misconduct during closing argument; the indictment

against him should have been dismissed for pre-indictment delay; and finally that the district court

improperly sentenced him.  For the reasons set forth below, we AFFIRM the district court's

_____

        *The Honorable Karen Caldwell, United States District Judge for the Eastern District of Kentucky, sitting
by designation.

        [1]Section 841(d)(2) has since been modified, and is now found at 21 U.S.C. § 841(c)(2).

judgment as to the first four assignments of error, but we conclude that the sentencing order must be VACATED and the matter REMANDED for re-sentencing.

## I.

We take our factual summary from the evidence presented by the government at trial. Merkosky is president of National Novelty Corporation located in Painesville, Ohio. National Novelty is a wholesale business that sells many of the products typically seen in convenience stores and gas stations, including products containing pseudoephedrine, an active ingredient in weight loss products and over-the-counter medications for the treatment of asthma and nasal congestion. In 1997, Merkosky filed an application to become a registered wholesale distributor of products containing pseudoephedrine, a List I chemical, *see* 21 C.F.R. §§ 1300.02(b)(18) and 1310.02(a)(11), whose distributors are required to register with the Drug Enforcement Administration ("DEA") because the substance is widely used in the illicit production of methamphetamine, a controlled substance. *See* 21 C.F.R. § 1309.21(a).

In response to Merkosky's application, Janice Margreta, a diversion investigator with the DEA met with Merkosky to explain the problems with diversion of these chemicals from legal to illegal use, and also to explain the record-keeping requirements. During the meeting, Merkosky identified his supplier of pseudoephedrine as Body Dynamics, Inc. ("BDI"). Merkosky was instructed that as the registrant, he would be required to keep a record of all purchases and sales of pseudoephedrine exceeding specified threshold amounts, and to keep internal records of customer lists and customer records for the DEA. He was specifically instructed that the registrant is the person responsible for keeping accurate sales records. After also being advised of the danger that pseudoephedrine products could be diverted to make methamphetamine, Merkosky was approved

2

to distribute pseudoephedrine and a DEA Certificate of Registration was issued to National Novelty in December 1997.

In the spring of 1999, at Merkosky's request, DEA Agent Michael Malasky and his supervisor met with Merkosky at his place of business in Painesville. Merkosky told the agents that some Arab store owners were asking him to sell them increasingly greater amounts of pseudoephedrine, but he did not give the DEA the names of any these store owners. Malasky, who characterized the visit as a "courtesy call," informed Merkosky that if he had a problem with an individual store owner, he should give them the owner's name, and the agents would visit that owner.

Shortly thereafter, Malasky received a warning letter from Washington containing a "suspicious activity report," indicating that some of BDI's product that had been shipped from Painesville, Ohio, had been seized from a methamphetamine lab in a body shop in Pasadena, California. Malasky went to National Novelty to examine the business's records and determined from the invoices that National Novelty had purchased a product called "Mini-Thins" from BDI, bearing the same lot number as the pseudoephedrine products confiscated in the methamphetamine lab in California. After interviewing many of the customers on Merkosky's customer list, Malasky contacted Merkosky and asked him repeatedly whether the records he had supplied to the DEA reflected all the pseudoephedrine he had purchased and sold. Merkosky eventually admitted to Malasky that he had purchased and sold quantities of pseudoephedrine from Auburn Pharmaceutical as well as from BDI, and he provided Malasky with those sales records.

On September 23, 1999, pursuant to a search warrant covering Merkosky's business, house, and personal property, agents seized record documents, sales invoices from BDI and Auburn

3

Pharmaceutical, and six computers. The invoices seized from Merkosky were not consistent with the invoices the DEA had received from Auburn Pharmaceutical, including a June 23, 1999, Auburn invoice for the sale to Merkosky of 15 cases of pseudoephedrine worth $13,392, which was not reflected in Merkosky's records. Further investigation revealed that there were multiple discrepancies in Merkosky's records and that a significant number of sales reported in those records were to customers who had either never done any business with Merkosky or National Novelty, had made purchases of pseudoephedrine, but not in 1999 as the records reported, or had purchased pseudoephedrine from Merkosky, but in much smaller quantities than those listed in his records. At least one of the alleged purchasers, a Convenient Food Mart in Cleveland, Ohio, had been closed several years prior to this time frame and could not have made any purchases in 1999.

Merkosky's defense at trial centered around the theory that he sold pseudoephedrine products to "buying groups," or retailers who would purchase large quantities of the product and then resell it in smaller quantities to other retailers. He claimed that the discrepancies in National Novelty's records were due to his attempts to comply with the DEA's requests that he keep records of the sales to secondary retailers, not the original buying group, and because retailers were not required to keep their own records, which led to poor record keeping at the retail level. Merkosky also argued that his wife, LaVonda Merkosky, and a salesman named Paul Phillips were responsible for National Novelty's bookkeeping, and that he did not know whether National Novelty's records with regard to sales of pseudoephedrine were correct or not.

On August 7, 2002, the jury returned a verdict finding Merkosky guilty of possession with intent to distribute pseudoephedrine in violation of 21 U.S.C. § 841(d)(2), and furnishing false or fraudulent sales records in violation of 21 U.S.C. § 843(a)(4)(A). He was sentenced to 135 months'

imprisonment on the possession charge and 36 months' imprisonment on the false records charge, to be served concurrently. On appeal, Merkosky argues that (1) the evidence was insufficient to sustain his convictions; (2) 21 U.S.C. § 841 lacks a mens rea requirement and is therefore unconstitutional; (3) the prosecutor engaged in misconduct during closing arguments; (4) the indictment should be dismissed because the government's pre-indictment delay violated his due process rights; and (5) he was sentenced improperly because the federal sentencing guidelines are unconstitutional and the pre-sentence report was based on "misinformation" provided by the prosecutor.

**II.**

In his first assignment of error, Merkosky argues that the prosecution failed to present sufficient evidence to support a conviction on either of the charges. We note that this claim was properly preserved by Merkosky's trial counsel. In reviewing a conviction for sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "This court must uphold a jury verdict if there is substantial evidence, viewed in the light most favorable to the government, to support it. In considering the evidence, we allow the government the benefit of all reasonable inferences and refrain from independently judging the weight of the evidence." *United States v. Wells*, 211 F.3d 988, 1000 (6th Cir. 2000) (internal citations omitted).

The district court charged the jury that in order to convict Merkosky of possession with intent to distribute pseudoephedrine in violation of 21 U.S.C. § 841(d)(2), the government must prove: (1) that Merkosky knowingly possessed and distributed pseudoephedrine, (2) that

5

pseudoephedrine is a listed chemical, and (3) that Merkosky possessed and distributed pseudoephedrine knowing, or having reasonable cause to believe, that it would be used to manufacture methamphetamine. Merkosky challenges only the third element, arguing that "[t]here is absolutely no evidence to establish any link between Mr. Merkosky and any illicit drug activity." He points out that no methamphetamine was found at the California methamphetamine lab, and contends that in any event the purchase of the pseudoephedrine found there could have been made at the retail level.

The evidence presented at trial establishes that the DEA explained to Merkosky the record-keeping requirements concerning List I chemicals, and Merkosky knew about the registrant's responsibilities, including the necessity of keeping records of those individuals or businesses from which he purchased and to which he sold pseudoephedrine products. He also knew that pseudoephedrine could be made into methamphetamine. Despite all of this, by his own admission Merkosky sold pseudoephedrine to groups that he knew could be diverting it, and kept inaccurate records that reflected sales to alleged secondary purchasers rather than the actual purchasers to whom he sold the product. Two cases of product sold by Merkosky were seized from a California methamphetamine lab. The evidence establishes that only after significant direct questioning by the DEA did Merkosky acknowledge that he had not purchased pseudoephedrine only from BDI, but that he was also purchasing it from Auburn Pharmaceutical, and the evidence further establishes that he did not keep any record at all of significant purchases of the product from Auburn. Finally, the evidence establishes that of the approximately 428 cases of pseudoephedrine products purchased by National Novelty in 1999, 70 cases listed in Merkosky's records as sold to various retailers could not be traced to those retailers. The government presented the testimony of numerous retail shop

6

owners listed in National Novelty's sales records that had either never done any business with Merkosky or National Novelty, had made purchases of pseudoephedrine, but not in 1999, or had purchased pseudoephedrine from Merkosky, but in much smaller quantities than those listed in his records. When viewed in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt each of the elements of the charge of possession with intent to distribute pseudoephedrine.

The district court charged the jury that in order to convict Merkosky of knowingly and intentionally furnishing false and fraudulent material information in sales records kept by National Novelty, records required to be kept under 21 U.S.C. § 830(a), 21 C.F.R. §§ 1310.03(a) and 1310.05(a)(1), in violation of 21 U.S.C. § 843(a)(4)(A), the government must prove: (1) that Merkosky knowingly furnished false or fraudulent information, (2) the statement was made regarding a matter within the jurisdiction of any department or agency of the United States, and (3) the information furnished or omitted was material. Merkosky argues that the record-keeping at National Novelty was done by his wife LaVonda and by one of the company's salesmen, Paul Phillips, and that he did not knowingly provide any misinformation to the government.

Both DEA Agents Margreta and Malasky testified that as the individual distributing pseudoephedrine, Merkosky is the "regulated person" under 21 U.S.C. § 802(38) who is responsible for record keeping pursuant to 21 U.S.C. § 830(a), 21 C.F.R. §§ 1310.03(a) and 1310.05(a)(1). The evidence demonstrates that Merkosky was well aware of the record-keeping and reporting requirements that he faced as the registrant. Despite his claim that his wife and employee Paul Philips were responsible for all of the record-keeping, Merkosky testified that he kept records on sales of cases of pseudoephedrine and that his records often did not reflect the initial sale to the

7

actual purchasers, but listed only the secondary retail purchaser. He admitted that evidence of these "buying groups" was not reflected in National Novelty's records, but claimed that the DEA had asked him to keep the records this way, a claim that Malasky testified was untrue. Furthermore, National Novelty's records were also inconsistent with the sales records provided to the DEA by Auburn Pharmaceuticals, a business Merkosky initially denied purchasing pseudoephedrine from, and whole shipments of product were not reflected in National Novelty's records at all. This evidence, when viewed in the light most favorable to the prosecution, is sufficient to sustain Merkosky's conviction on the false records charge.

### III.

In his second assignment of error, Merkosky argues that the mens rea component of 21 U.S.C. § 841(d)(2) is unconstitutionally vague. He raises this challenge for the first time on appeal. Generally, a challenge to the constitutionality of a statute not raised below is waived and will not be considered on appeal. *United States v. Chesney*, 86 F.3d 564, 567 (6th Cir. 1996). A reviewing court may exercise its discretion, however, to consider an issue not raised below in an "exceptional case or particular circumstances, or when the rule would produce a plain miscarriage of justice." *Id.* at 567-68. Since a lawfully passed statute is entitled to "strong presumptive validity," *see United States v. National Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963), and courts have held that the "knowing or having reasonable cause to believe" standard in 21 U.S.C. § 841(d)(2) imposes a constitutionally sufficient mens rea requirement, *United States v. Saffo*, 227 F.3d 1260, 1268-69 (10th Cir. 2000), *cert. denied*, 532 U.S. 274 (2001), we find that there is nothing here to indicate that this case is "exceptional" or would result in a miscarriage of justice, and we therefore decline to exercise our discretion to consider this claim.

8

**IV.**

In his third assignment of error, Merkosky alleges that he was denied a fair trial when the prosecutor committed misconduct by misstating facts during closing arguments. Because counsel did not object to the closing statements, we review this claim for plain error. *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994). We employ a two-prong test when reviewing a claim of prosecutorial misconduct. First, we determine whether the comments were improper. *United States v. Galloway*, 316 F.3d 624, 632 (6th Cir. 2003). If the comments were improper, we then determine whether they were flagrant, requiring reversal. *Id.* In determining whether the remarks were flagrant, we consider the prejudicial effect to the defendant; whether the remarks were isolated or pervasive; whether the remarks were deliberate or accidental; and the strength of the evidence against the accused. *Id.*

Merkosky specifically cites three alleged examples of misconduct during the closing statements:

> 1. "And then we have the defense that well, I was working for the DEA . . . . The testimony was, I was working for the DEA."
>
> 2. "By his own admission those drugs ended up in the meth lab, just like they warned him against . . . . [T]wo cases we know eventually ended up in a meth lab, and the registrant first was responsible for keeping the records, does not do so."
>
> 3. "We heard the defendant testify he was selling to buying groups . . . . There is not one shred of evidence anywhere, other than from his lips, that there were buying groups, nothing."

None of these statements was improper, much less flagrant. Although Merkosky now argues that at no time did he ever state that he was working for the DEA, our review of the record satisfies us that the prosecutor's first comment was supported by the evidence at trial. Merkosky testified that Malasky asked him not to discontinue selling pseudoephedrine, because the DEA wanted

9

Merkosky's help in finding out who was diverting his product from retailers. Merkosky stated that he continued to sell multiple cases of pseudoephedrine, despite his desire to stop selling the product, because he was advised to do so by the DEA. The district court permitted the government to call Agent Malasky on rebuttal to counter the testimony that Merkosky was working with the DEA. The prosecutor's comment in his closing argument, therefore, reflected Merkosky's own testimony.

The second comment was also supported by the evidence at trial. Merkosky argues that Detective Watson testified that the pseudoephedrine linked to National Novelty was not found in an actual meth lab, and that he was never responsible for the record keeping at National Novelty. To the contrary, while Watson did state that there was no "active lab work" going on while he was at the Pasadena body shop, his testimony was full of references to the body shop as a "meth lab." He testified that he investigated the body shop after being told by an informant that it was being used to manufacture methamphetamine. During Watson's search of the body shop, he found several cardboard boxes containing bottles of pseudoephedrine, as well as equipment used for extracting pseudoephedrine and manufacturing methamphetamine. Furthermore, it cannot be seriously argued that Merkosky was not responsible for keeping the records. The record establishes that Merkosky was specifically instructed that as the individual who signed the application for registration he was responsible for keeping the records.

The prosecutor's third statement was also accurate. Merkosky was the only person at trial who used the words "buying groups" when testifying, and the records showed no evidence of buying groups. Absent a timely objection, only flagrant misconduct warrants plain error reversal. *Carroll*, 26 F.3d at 1384-90. We find no plain error here.

**V.**

10

In his fourth assignment of error, Merkosky argues that the government delayed over two and one half years before bringing charges against him, and that this delay violated his due process rights under the Fifth Amendment. Dismissal for pre-indictment delay is only justified when the defendant can show substantial prejudice to his right to a fair trial and that the delay was an intentional device by the government to gain a tactical advantage. *United States v. Rogers*, 118 F.3d 466, 475-76 (6th Cir. 1997); *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992). Merkosky argues that such was the case here, where he was indicted on May 8, 2002, for crimes alleged to have been committed in 1999.

Merkosky cannot show that he was substantially prejudiced. Although he argues that National Novelty was only obligated to keep records of its pseudoephedrine purchases and sales for two years, and that it was unfair to make him defend those records after that time, the records seized by the DEA were for the time period of the illegal possession and false record-keeping with which Merkosky was charged; and those records were forwarded to Merkosky's trial counsel during discovery, and were available to both parties during trial. Merkosky also complains that the delay made it impossible for him to obtain records from the various retailers to whom he allegedly sold the product in 1999. But Merkosky himself recognizes that the retailers were not under any requirement to keep records at all. And it is largely irrelevant that Merkosky might not have been able to obtain the retailers' records since numerous retailers testified at trial that they had either never heard of National Novelty or done any business with them, or had not purchased pseudoephedrine at the times or in the quantities that Merkosky's records showed.

The government notes that the indictment was brought within the statute of limitations, and has proffered legitimate investigatory reasons for any delay. Three of the computers seized in

11

September 1999 contained a virus, the "Stoned Monkey Virus," that prevented users from turning on the computers. This necessitated the DEA's copying of the computers' memories in order to access the records stored on the computers. After Agent Malasky received all of the information from the computers, which took almost six months, he then conducted interviews with store owners listed in those records who were located in both Cleveland and Youngstown. "[T]o prosecute a defendant following investigative delay does not deprive him of due process." *United States v. Lovasco*, 431 U.S. 783, 796 (1977). Accordingly, Merkosky cannot show that he was substantially prejudiced or that the delay was an intentional device by the government to gain a tactical advantage.

## VI.

For his final assignment of error, Merkosky challenges his sentence, arguing that the district court improperly calculated his base offense level at level 30 after finding that he diverted over 20 kilograms of pseudoephedrine, and also that the district court's finding that he perjured himself by claiming that he was working for the DEA was not supported by the record. The latter finding resulted in a two-point addition for obstruction of justice to Merkosky's base offense level of 30, setting the total offense level at 32. After the briefs were filed in this appeal, Merkosky also filed supplemental briefs, challenging his sentence under the Supreme Court's decisions in *Blakely v. Washington*, 124 S. Ct. 2531 (2004), and *United States v. Booker*, 125 S. Ct. 738 (2005).

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory federal sentencing guidelines violated the Sixth Amendment by requiring judges to enhance the sentences of defendants based on facts not found by a jury or admitted by the defendant. To remedy this problem, the Court excised from the Sentencing Act the provisions making the guidelines

12

mandatory. *Id.* at 764. *Booker* then instructed reviewing courts to apply its Sixth Amendment holding and its remedial interpretation of the Sentencing Act to all cases on direct review. *Id.* at 769. *Booker* further mandated that reviewing courts apply ordinary prudential doctrines, such as plain error review, to determine if re-sentencing is warranted. *Id.*

Merkosky's base offense level was calculated and his sentence was enhanced, pursuant to the mandatory federal sentencing guidelines in place at the time, based on facts found by the sentencing judge. The parties do not dispute that Merkosky's base offense level of 30 was calculated and his sentence was enhanced based on facts that were neither proved to a jury beyond a reasonable doubt nor admitted by Merkosky himself. His sentence therefore violates the Sixth Amendment under *Booker*. Since Merkosky failed to make a Sixth Amendment objection at sentencing, however, we conduct plain error review to determine whether he must be re-sentenced. Under that test, there must be (1) error, (2) that is plain, (3) and that affects substantial rights. *United States v. Oliver*, 397 F.3d 369, 378 (6th Cir. 2005). If these three conditions are met, an appellate court may then exercise its discretion to notice the forfeited error if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

Merkosky's sentence in violation of the Sixth Amendment constitutes error that is plain. *Id.* at 378-79. Moreover, according to this circuit's precedent in *United States v. Oliver*, a sentence enhancement based on judge-found facts under a mandatory guidelines system necessarily affects Merkosky's substantial rights.[2] *Id.* at 379-80. Finally, *Oliver* dictates that any sentencing error that

___

[2]Speaking only for myself, I note my disagreement with *Oliver*'s unwarranted departure from traditional plain error review. Despite purporting to apply plain error review, *Oliver* fails even to discuss, much less enforce, the defendant's traditional burden of proving that the district court's error prejudiced him. *Oliver* reasoned that since the defendant received a sentence "beyond that which was supported by the jury verdict and [his] criminal history," he was necessarily prejudiced because he "*arguably* received a sentence that was longer than his sentence would have been absent a Sixth Amendment violation." *Oliver*, 397 F.3d at 379-80 (emphasis added). "Arguably" is not

leads to a violation of the Sixth Amendment by imposing a more severe sentence than is supported by the jury verdict automatically diminishes the integrity and reputation of the judicial system. *Id.* at 380. Merkosky's case must therefore be remanded for re-sentencing.

## VII.

For the foregoing reasons, we **AFFIRM** the judgment of conviction in all respects; we **VACATE** the district court's sentencing order and **REMAND** the case to the district court for re-sentencing.

---

enough, however. Under the ordinary plain error review that *Booker* requires, 125 S. Ct. at 769, a defendant bears the burden of proving that he was prejudiced by the error, *United States v. Olano*, 507 U.S. 725, 734 (1993): i.e., that absent that error, he would more likely than not have received a lower sentence. By simply ignoring this requirement, *Oliver* effectively holds that every Sixth Amendment violation in a *Booker*-type case automatically prejudices a defendant, a holding that is not required by *Booker*, *see Booker*, 125 S. Ct. at 769, and which does not comport with Supreme Court precedent. Nevertheless, as *Oliver* is now binding precedent in this circuit, I am bound to follow its mandate unless and until a contrary rule is developed by this court *en banc* or by the Supreme Court.

**KAREN NELSON MOORE, Circuit Judge, concurring.** I concur in all of Judge Batchelder's opinion except footnote two, which I decline to join.