**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff - Appellee,*

v.

KENIA MUNGUIA,
  *Defendant - Appellant.*

No. 10-50253

D.C. No.
2:08-cr-00767-
PSG-2

OPINION

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted
January 9, 2012–Pasadena, California

Filed November 27, 2012

Before: Stephen Reinhardt and William A. Fletcher, Circuit
Judges, and Charles R. Breyer, District Judge.[*]

Opinion by Judge Fletcher;
Concurrence by Judge Breyer

---

[*] The Honorable Charles R. Breyer, United States District Judge for the Northern District of California, sitting by designation.

## SUMMARY[**]

### Criminal Law

Reversing a drug conspiracy and possession conviction, the panel held that the district court erred in refusing the defendant's requested jury instruction that the requisite "reasonable cause to believe" that the drugs were being used to manufacture methamphetamine must be evaluated from the defendant's perspective.

Concurring, Judge Breyer wrote that defendants do not have *carte blanche* to introduce scienter evidence of marginal probative value that tends to "induc[e] decision on a purely emotional basis" or run afoul of Fed. R. Evid. 403 factors.

### COUNSEL

Karen Landau, Oakland, California for the Appellant.

Curtis Arthur Kin, Anthony James Lewis, Justin Randall Rhoades, and Jennifer Leigh Williams, Office of the United States Attorney, Los Angeles, California for the Appellee.

Sheryl Gordon McCloud, Seattle, Washington; Peter Goldberger, Ardmore, Pennsylvania, Amicus Curiae, California Partnership to End Violence, National Clearinghouse for the Defense of Battered Women, and National Association of Criminal Defense Lawyers.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

W. FLETCHER, Circuit Judge:

After a jury trial, Appellant Kenia Munguia was convicted of conspiring to possess and of possessing pseudoephedrine, knowing or having reasonable cause to believe that it would be used to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(2). The key question at trial was whether Munguia knew or had reasonable cause to believe that the drugs she purchased were being used to manufacture methamphetamine. Munguia appeals her conviction. She contends that the district court erred as a matter of law in refusing a requested jury instruction specifying that "reasonable cause to believe" must be evaluated from her perspective, based on her knowledge and sophistication. The instruction given by the district court provided that "reasonable cause to believe" should be evaluated from the perspective of a hypothetical reasonable person rather than from the perspective of Munguia. We hold that the district court erred in refusing Munguia's requested instruction and that the error was not harmless.

## I. Background

Pseudoephedrine is a common ingredient in many over-the-counter cold medications, including Sudafed, Claritin-D, and similar cold-and-allergy medications. Pseudoephedrine is a methamphetamine precursor. To combat the manufacture and distribution of methamphetamine, federal law limits the quantity of pseudoephedrine that retailers can sell to individual consumers, as well as the quantity that individual consumers can purchase. Under the Combating Methamphetamine Epidemic Act of 2005, retailers can sell

only 3.6 grams of pseudoephedrine per day to any particular individual. 21 U.S.C. § 830(d)(1). An individual can purchase only nine grams in a thirty-day period. § 844(a). A box of over-the-counter cold medication typically contains 2.4 grams of pseudoephedrine.

To ensure compliance with federal and state law, many retailers contract with MethCheck, a privately managed database that tracks the purchase of drugs containing pseudoephedrine. Retailers using MethCheck require that purchasers of drugs containing pseudoephedrine provide identification and an electronic signature at the time of purchase. MethCheck records each purchase for which identification is provided and keeps a record of the purchase history of each purchaser.

On June 13, 2008, the government charged Munguia, Munguia's boyfriend Edwin Alas, Alas's brother David Hernandez, and two others with illegally obtaining large amounts of pseudoephedrine for use in the manufacture of methamphetamine. Alas, the leader and organizer of the group, quickly cooperated with the government and pled guilty. An indictment was returned against Munguia and the three others on July 1. It charged one count of conspiracy "[t]o possess a listed chemical, namely pseudoephedrine, knowing and *having reasonable cause to believe* that the pseudoephedrine would be used to manufacture . . . methamphetamine," in violation of 21 U.S.C. § 841(c)(2). (Emphasis added.) It charged a second count of "knowingly and intentionally possess[ing] . . . approximately 184.8 grams of pseudoephedrine, knowing, and *having reasonable cause to believe*, . . . [that it] would be used to manufacture . . . methamphetamine," also in violation of § 841(c)(2). (Emphasis added.) It was sufficient to convict under the

indictment and under § 841(c)(2) that a defendant either knew *or* had reasonable cause to believe.

Munguia pled not guilty and went to trial. Munguia admitted that she had purchased a significant amount of pseudoephedrine at the direction of Alas. However, there was starkly conflicting evidence about what Munguia knew or had reasonable cause to believe about pseudoephedrine's role in the production of methamphetamine. Alas was the government's key witness on this question. He testified that he told Munguia that the pseudoephedrine would be used to make methamphetamine. Munguia testified that Alas had told her no such thing. She testified that she had not known that pseudoephedrine could be used to make methamphetamine or that the purchase of cold medications could be illegal. She attributed her ignorance in part to the fact that, due to her fear of Alas, she had not asked him probing questions.

Munguia requested a jury instruction that would have told the jury to decide whether Munguia "knew or had reasonable cause to believe" based on what Munguia herself knew or should have known, rather than on what a hypothetical reasonable person had reasonable cause to believe. The district court refused her requested instruction, instead giving an instruction proposed by the government that referred simply to "a reasonable person."

The jury convicted Munguia on both counts. We hold that the district court erred when it refused Munguia's requested instruction and that the error was not harmless. We do not reach other questions presented in this appeal.

## II. Standard of Review

When a party properly objects to a jury instruction, we review de novo whether the instructions given "accurately describe the elements of the charged crime." *United States v. Heredia*, 483 F.3d 913, 921 (9th Cir. 2007) (en banc). We apply harmless error analysis to determine whether an improper instruction constitutes reversible error. *United States v. Thongsy*, 577 F.3d 1036, 1040 (9th Cir. 2009).

## III. Evidence at Trial

At trial, the jury was presented with two irreconcilable stories. Alas, the government's cooperating witness, testified unambiguously that Munguia knew that the pseudoephedrine would be used to make methamphetamine. Munguia, who took the stand on her own behalf, testified unambiguously that she did not know. We summarize the conflicting evidence in order to provide a basis upon which to evaluate the disputed jury instruction.

### A. The Government's Evidence

MethCheck records introduced at trial established that between February and June 2008, Munguia visited 564 retail pharmacists and purchased 847 boxes of cold medication. These boxes contained a total of 1,885.2 grams of pseudoephedrine.

Detective Tyrone Miles of the Los Angeles Police Department testified that he observed Alas, Munguia, and the other defendants as they spent a day going to pharmacies in Los Angeles. Miles testified that Munguia drove the group to eleven pharmacies on April 23, 2008. He stated that he

followed the group into a store and "observed each one approach the counter and purchase Pseudoephedrine products." Detective Miles testified that he saw the group discard items in the trash as they left the pharmacies. Police later retrieved these discarded items, which were identified as empty cold medication boxes and receipts itemizing the purchases. Miles testified that when he arrested Munguia, she was seated near "a large amount of Pseudoephedrine pills in a plastic bag." The car also contained "empty Pseudoephedrine-based boxes, receipts, [and] cell phones." The pseudoephedrine pills were found rubber-banded in packs of ten.

Alas, Munguia's former boyfriend and the government's star witness, agreed with the defense attorney on cross-examination that he "very quickly made a decision to try to work for the Government to get . . . out of some of the trouble [he was] in." Under his cooperation agreement, he pled guilty and served only a month in jail before being released pending sentencing. Testifying at Munguia's trial was a condition of Alas's cooperation agreement. He admitted in his testimony that he hoped his cooperation would result in a reduced sentence.

Alas told the jury that he began buying pseudoephedrine pills in early 2008. He explained that he was recruited by "a guy named Pirulin," who asked him if he wanted to make "easy money" purchasing cold medication. He claimed he could not remember Pirulin's real name. Alas testified that he knew from the first day of his involvement with Pirulin that the cold medication he purchased was used to make methamphetamine. He testified that the first time he purchased the medication, "store clerk[s] started asking [him] questions. They would say, 'Are you making meth with these

pills? What are you doing? Why are you buying them?'" Alas testified that when he asked Pirulin, he was told that the drugs were being used to manufacture methamphetamine and was warned to be careful.

Alas testified that he brought Munguia into the project several weeks later, when Pirulin asked him to begin recruiting people to assist him. He testified that he thought Munguia would be "a good candidate." He testified that she had been complaining that he was not spending enough time with her, and that "she was out of a job and . . . wanted to make money." According to Alas, Munguia agreed to participate immediately. He told the jury that she "offered . . . to bring her auntie into this business because she worked at a pharmacy and she could get more Sudafed pills . . . ." Alas testified that Munguia told him that she would "get right to it, and that day she went out to stores by herself, and by the next day she had a couple boxes."

Alas testified that when he first recruited Munguia, he did not explain why the pills were valuable. However, he said that she came to him the day after she purchased her first boxes of cold medication and asked "why were the clerks asking her those questions." "She specifically said those questions, are they being used to make meth, and I told her yes." Alas testified that he warned her that "if she's going to start doing this . . . to be careful, make sure nobody is following you because she could get in trouble for it." Alas further testified that he heard the clerks ask Munguia, "'Are you making meth with these pills?'"

On cross-examination, Alas admitted that in August 2008, after he had agreed to cooperate with the government and after Munguia and the others had been indicted, he had told

government attorneys and agents that he did not remember telling Munguia that the pills were used to make methamphetamine. Alas first explained his memory failure by stating that their questions did not focus on Munguia. He testified, "[T]he only reason I didn't tell them . . . [was] because we were focusing on other people and who I was selling to, and Kenia Munguia wasn't the primary focus in that meeting." He said that his current testimony did not contradict his previous statement to the government: "If you read carefully, it says that I do not recall, I do not remember." On further cross-examination, Alas changed his story. He admitted that the government attorneys and agents had specifically asked him whether he had told Munguia that the pills were used to make methamphetamine. He admitted that he had answered, in response to their specific questioning, that he did not remember telling Munguia that the pills were to be used for that purpose.

Alas testified that Munguia usually drove him to locations where he would sell the cold medications for $25 to $27 per box. He testified that Munguia would remain in the car or stay outside when he went to sell the pills. He testified that upon returning to the car, he immediately shared the proceeds with Munguia, giving her the entire amount he received for each box that Munguia had purchased. He testified that he treated Munguia as his equal partner and that he never made a profit off the pseudoephedrine she had purchased. "[W]hatever she purchased, whatever . . . she gave me, what she bought out of her pocket, that's what she got . . . . I wasn't taking no money out of what she purchased." Alas testified that sometimes he and Munguia each made $1,000 in a day.

On direct examination, Alas testified that he once slapped Munguia after an argument at a nightclub. He said, "[W]e were talking and she got very argumentative, and that's when I slapped her." On cross-examination, Alas denied hitting Munguia on any other occasion.

## B. Munguia's Evidence

Munguia's sister Jennifer testified that she had seen Alas hit Munguia. She said she had been with Alas and Munguia at a nightclub in late May 2008. Jennifer said that they argued when Alas refused to give Munguia the keys to her car. A security guard intervened at Munguia's request. He required Alas to return the keys and then evicted him from the club. Jennifer testified that Alas came to their house later that evening. "He started yelling at my sister and he grabbed her by the arm. And he hit her like this, like with a closed fist. And he hit her and he started screaming at her. And my sister asked us to please call 911. And my cousin did it . . . . So Edwin came and he grabbed my sister and he took her out of the house." Jennifer testified that after Alas learned that 911 had been called, "he told me that if I did it, that I was going to pay the consequences for getting involved."

Munguia testified on her own behalf. She came to the United States from El Salvador when she was about thirteen. She left school in the United States after completing the ninth grade. Because her English skills are limited, she testified through a translator. Munguia admitted that she had purchased a large amount of pseudoephedrine over a period of several months. She testified, however, that she did not know that the cold medications she purchased would be used to manufacture methamphetamine.

Munguia testified that she met Alas in May 2007, and that they began dating in July of that year. At the beginning, "[h]e was a nice person to me," but in August 2007 they had an argument and Alas "turned very violent." She testified that Alas "is a very violent person." She testified, "He used to insult me verbally and he even slapped me . . . . He would pull my hair." She explained, "He wasn't violent all of the time with me. After he would abuse me, he always asked for forgiveness. And I wanted things to be fine between him and me. I felt lonely and depressed. And I tried my best so that he would be happy with me." She testified that it was common for Alas to slap her if he thought she was being argumentative. She testified that he had punched her in the face with a closed fist, but that "he always tried not to leave marks."

Munguia testified that Alas first asked her to purchase cold medication in February 2008. She testified that he took her to a store and bought pills, so that he could show her how to buy them and what kind to purchase. That same day, she explained, he took her to at least one more store, where she purchased the pills herself. On cross examination, she testified that she was unsure whether Alas had in fact purchased pills that first day. She testified that she bought pills from February through June 2008 "[b]ecause he was asking me to."

Munguia testified that she earned nothing from her efforts. She testified that at the beginning Alas gave her $100 or $200 "[e]very day in the morning" to buy pills. She said that they then had an argument because Alas believed that she was "keeping his change." Thereafter, Alas would give the exact amount at the store or would give her only $20.

Munguia directly contradicted Alas's testimony that he gave her the profit from each of the boxes of pills that she purchased:

> Q: [Y]ou heard him testify how he would go sell the pills and then give you the money, 25, $27 or so per box for every box you had purchased. You heard that testimony, right?
> A: I did hear that.
> Q: Is that true?
> A: No.
> Q: Were you a partner with [Alas] in this?
> A: No.
> Q: Apart from maybe having kept the change at the end of a day early on, did you make any money at all from this?
> A: No.
> Q: And how were you getting by during this time if you weren't making money from [Alas]?
> A: I asked my mother for money.

Munguia testified that during the time she was purchasing pills she "didn't even have any idea what methamphetamine was." She testified that she twice asked Alas why they were purchasing the pills. "The first time he told me that it was better for me not to know." She testified that she did not ask Alas any further questions at that time:

> Q: Did you ask him any more questions after he said that?
> A: No, because he answered that in not a very nice way.

> Q: And so why didn't you ask him a follow-up question?
> A: I was always afraid of asking him anything.
> Q: And why is that?
> A: Because he was a violent person and he always answered me in a nasty way, and I didn't like him to yell at me.

She testified that the second time she asked, he answered that "he and his friends would take them with Red Bull." She said that she was not satisfied with his answer but did not inquire further. She testified that he offered to give her some to try, but that she refused.

Munguia told the jury that when she bought the pills she was asked for identification by store clerks and was required to sign her name. She said that she took this as evidence that her purchases were legal:

> Q: Did that concern you at all that you were buying these pills using your correct identification and so forth?
> A: No. I thought it was legal. It was legal to me because I was showing my I.D.

## IV. The Jury Instruction

Munguia was charged with conspiracy "[t]o possess a listed chemical, namely, pseudoephedrine, knowing and having reasonable cause to believe that the pseudoephedrine would be used to manufacture . . . methamphetamine" in violation of 21 U.S.C. § 841(c)(2) and with "knowingly and intentionally possess[ing] . . . approximately 184.8 grams of

pseudoephedrine, knowing, and having reasonable cause to believe, . . . [that it] would be used to manufacture . . . methamphetamine" in violation of § 841(c)(2). Munguia objected to the government's proposed jury instruction that explained the "reasonable cause to believe" standard.

The government requested the following jury instruction: "'Reasonable cause to believe' means that the defendant subjectively knew facts that either caused her or *would cause a reasonable person to believe* that the pseudoephedrine would be used to make illegal drugs." (Emphasis added.) Munguia objected to this instruction. Her proposed instruction read: "'Reasonable cause to believe' means that the defendant subjectively knew facts that either caused her, or *would have caused a reasonable person in her same position, to believe* that the pseudoephedrine tablets would be used to make illegal drugs." (Emphasis added.) The court gave the government's proposed instruction.

Our cases make clear that the district court erred in rejecting Munguia's proposed instruction. In *United States v. Kaur*, 382 F.3d 1155, 1156 (9th Cir. 2004), defendant Kaur was a retailer who sold large quantities of cold medications. Kaur was charged with violating 28 U.S.C. § 841(c)(2). *Id.* She had requested an instruction that effectively would have required the jury to find that she had actual knowledge that the pseudoephedrine in the medication would be used to manufacture methamphetamine. *Id.* at 1157. We upheld an instruction that allowed the jury to convict based on a finding that Kaur had reasonable cause to believe that it would be so used. *Id.* at 1156. We agreed with the Tenth Circuit in *United States v. Saffo*, 227 F.3d 1260 (10th Cir. 2000), which had interpreted § 841(d)(2), now § 841(c)(2), to require an

evaluation of the subjective state of the mind of the particular defendant. We quoted *Saffo*:

> "[T]he standard involves a subjective inquiry that looks to whether the particular defendant accused of the crime knew or had reasonable cause to believe the listed chemical would be used to manufacture a controlled substance. *This requires scienter to be evaluated through the lens of this particular defendant, rather than from the perspective of a hypothetical reasonable man.*"

*Kaur*, 382 F.3d at 1157 (quoting *Saffo*, 227 F.3d at 1268-69) (emphasis added). We wrote, "The district court explained that [its instruction] incorporates both subjective and objective elements: Ms. Kaur had reasonable cause to believe if she actually knew facts that would alert a reasonable person that the pseudoephedrine would be used to make methamphetamine." *Id.* at 1157.

In *United States v. Johal*, 428 F.3d 823, 825-26 (9th Cir. 2005), defendant Johal, like Kaur, was a retailer who sold large quantities of cold medications. Johal was prosecuted under § 841(c)(2), and we upheld a jury instruction that allowed conviction under the "reasonable cause to believe" standard. *Id.* at 825. Relying on *Kaur*, we wrote, "[R]easonable cause to believe is not purely objective, but turns on *the facts actually known by the defendant* in a particular case—facts from which the jury can infer that any reasonable person in the defendant's position would have had to know that the ingredients were being bought to make

illegal drugs." *Id.* at 828 (emphasis in original). As we did in *Kaur*, we quoted the Tenth Circuit's decision in *Saffo*:

> As a practical matter, . . . the differences between actual and constructive "knowledge" under the statute are not substantial. *See United States v. Saffo*, 227 F.3d 1360, 1268-69 (10th Cir. 2000) (holding that the "reasonable cause to believe" standard in § 841(c)(2) "*requires scienter to be evaluated through the lens of this particular defendant*, rather than from the [perspective] of a hypothetical reasonable man" and likening the standard to actual knowledge).

*Johal*, 428 F.3d at 828 (emphasis added).

Our opinions in *Kaur* and *Johal* make clear that the "reasonable cause to believe" standard of § 841(c)(2) requires a jury to evaluate scienter through the lens of the particular defendant on trial. Under § 841(c)(2), a jury must decide what the particular defendant on trial knew, and what that particular defendant had "reasonable cause to believe." The scienter requirement of § 841(c)(2) is not satisfied if some hypothetical person would have had "reasonable cause to believe" that cold pills would be used to make methamphetamine. The jury must therefore be instructed to consider the knowledge and sophistication of the particular defendant on trial, not that of a hypothetical reasonable person not before the court.

The government's instruction merely asked the jury to decide whether "a reasonable person" would have had cause to believe that the cold pills would be used to manufacture

methamphetamine. The district court erred in giving this instruction because it did not direct the jury to evaluate scienter "through the lens of the defendant," as required by § 841(c)(2).

## V. Harmless Error

An error in describing an element of the offense in a jury instruction is harmless only if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999). *See also Thongsy*, 577 F.3d at 1043. We conclude under this standard that the erroneous jury instruction was not harmless.

Munguia's sole defense was that when she purchased large quantities of cold medication containing pseudoephedrine she did not know or have reasonable cause to believe that the medication would be used to manufacture methamphetamine. If the jury believed Alas's testimony, the jury could have convicted Munguia under § 841(c)(2), concluding that she knew or had reasonable cause to believe that the medication would be used to manufacture methamphetamine. However, if the jury believed Munguia, it could have acquitted her. It could have concluded that the nature of her relationship with Alas was such that her fear of him prevented her from asking probing questions. It could have concluded, in light of her lack of knowledge and general lack of sophistication, that she did not know that the medication would be used to manufacture methamphetamine, and that, viewing the evidence through her "lens," she did not have reasonable cause to believe that it would be so used.

In its closing argument, the government characterized the reasonable cause to believe standard as "the real sticking point of the case." It argued that "even if [the jury] believe[d] the defendant, . . . the evidence, as applied to the law, . . . still leads to a guilty verdict because the defendant is guilty if she knew or if she had a reason to believe." It explained the "reasonable cause to believe" standard to the jury: "Reasonable cause to believe means that the defendant knew facts that either caused her to actually know *or would cause a reasonable person to believe* that the Pseudoephedrine . . . was being used to make an illegal drug." (Emphasis added.) The government argued that Munguia was "guilty even under her story" because "*a reasonable person would have known* that these pills were being used to make methamphetamine." (Emphasis added.)

The government stressed that the jury could convict Munguia based on what a hypothetical reasonable person would have had cause to believe. The government argued that "it all boils down to did the defendant know, should the defendant have known, *would a reasonable person have known*." (Emphasis added.) The government continued, "And the defendant's actions, the defendant's own choices, overwhelmingly answer that question again and again. Yes, the defendant knew. Yes, the defendant should have known. *And yes, a reasonable person would have known*." (Emphasis added.) "This defendant, in less than three months, walked into CVS pharmacies over 550 times, and she bought over 800 boxes of Pseudoephedrine pills. Those pills were being used to make methamphetamine. The defendant knew that. *And a reasonable person would have known that*." (Emphasis added.)

Munguia's attorney tried to convince the jurors that they should evaluate the "reasonable cause to believe" standard from the perspective of "a reasonable person in her position." He asked:

> So who is this reasonable person? Is it Special Agent Bradley Clemmer who testified as to how methamphetamine is made from Pseudoephedrine? He seems like a reasonable enough person. Is it Jennifer Williams [the prosecutor]? She seems like a reasonable enough person. Is it me? I think I'm a reasonable person.

He then answered his own question:

> No it's not. And why not? It's a reasonable person in the position of the defendant. Someone young, recent immigrant, little–some formal education, through the ninth grade with some difficulty–and in the position she was in with Mr. Alas with all–with everything that went on that. With all of the choking down of being able to ask any questions and all of that. So that is the standard that is to be applied here. It's a reasonable person in her position.

He argued that "this young, unsophisticated woman with little formal education was naive. No reasonable person in her position would have known."

However, the district court instructed the jurors to apply the government's rather than Munguia's theory of scienter.

The court directed jurors to look to the instructions, and nothing else, in determining the applicable law. The first jury instruction specified that jurors were to "apply the law as I [the district court] give it." The court emphasized that jurors "must follow the law as I give it whether [they] agree with it or not." The court cautioned that the "verdict must be solely based on the evidence and on the law as I have given it . . . in these instructions."

Because the instruction specified that Munguia's "reasonable cause to believe" defense should be evaluated based on what a hypothetical reasonable person would have had reasonable cause to believe, the jury was compelled to look to the scienter of that hypothetical reasonable person. Based on its understanding of the "reasonable cause to believe" standard, the government argued to the jury that even if it believed all of Munguia's testimony, it was still required to convict. But the jury instruction and the government's understanding were incorrect. If it had believed Munguia's testimony, and if it had been instructed to view Munguia's mens rea through her "lens," the jury could well have acquitted her. We do not find it "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder*, 527 U.S. at 18. We therefore conclude that the erroneous instruction was not harmless and that Munguia's conviction should be reversed.

## VI.  Other Issues

Munguia and an amicus argue strenuously that the district court improperly excluded expert testimony of a psychologist who would have testified that Munguia suffered from battered woman syndrome, and that this syndrome was relevant to

whether Munguia knew or had reasonable cause to believe the cold medication would be used to manufacture methamphetamine. It is unclear whether the district court would have excluded the proffered testimony if it had understood that "the reasonable cause to believe" standard under § 841(c)(2) must be evaluated with respect to the particular defendant before the court rather than with respect to a hypothetical reasonable person. It is also unclear what expert testimony might be proffered at a second trial, should there be one. Under these circumstances, it is neither necessary nor appropriate for us to opine on the correctness of the district court's exclusion of the proffered testimony.

It is also unnecessary to address other issues raised by Munguia.

### Conclusion

We hold that the district court erred in failing to give Munguia's requested jury instruction and that this error was not harmless. We therefore reverse Munguia's conviction.

**REVERSED.**

BREYER, District Judge, concurring:

District courts serve as gatekeepers responsible for admitting relevant evidence, except where the probative value of that evidence "is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. While the Court today has correctly stated

the standard for what it means to have a "reasonable cause to believe" under § 841(c)(2), the gatekeeper function remains unchanged.    Accordingly, defendants do not have *carte blanche* to introduce scienter evidence of marginal probative value that tends to "induc[e] decision on a purely emotional basis" or run afoul of the familiar Rule 403 factors.  *See* Fed. R. Evid. 403 & advisory committee's note.