**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | No. 16-30033 |
| v. | D.C. No. 9:15-cr-00011-DLC-1 |
| DAN CALVERT WALLEN, *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the District of Montana
Dana L. Christensen, Chief District Judge, Presiding

Argued and Submitted March 8, 2017
Portland, Oregon

Filed October 25, 2017

Before: Diarmuid F. O'Scannlain, Raymond C. Fisher
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Fisher

# SUMMARY*

## Criminal Law

The panel vacated the defendant's conviction after a bench trial for killing three grizzly bears in violation of the Endangered Species Act.

The panel rejected the defendant's contention that his offense was serious, rather than petty, entitling him to a trial by jury.

The panel held that the magistrate judge, who served as the trier of fact at trial, misconceived the self-defense element of the offense. The panel held that the "good faith belief" defense for a prosecution under 16 U.S.C. § 1540 is governed by a subjective, rather than an objective, standard, and is satisfied when a defendant actually, even if unreasonably, believes his actions are necessary to protect himself or others from perceived danger from a grizzly bear. Because the district court applied an objective standard, and the error was not harmless, the panel vacated the conviction and remanded for a new trial.

The panel rejected the defendant's contention that, even if the Constitution does not guarantee his right to a jury trial, he is entitled to one, because if he is again tried by a judge, that judge would have access to the defendant's record of conviction, biasing the trier of fact.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

John Rhodes (argued), Assistant Federal Defender; Anthony R. Gallagher, Federal Defender; Federal Defenders of Montana, Missoula, Montana; for Defendant-Appellant.

Megan L. Dishong (argued), Assistant United States Attorney, United States Attorney's Office, Missoula, Montana, for Plaintiff-Appellee.

**OPINION**

FISHER, Circuit Judge:

Dan Wallen appeals his conviction after a bench trial for killing three grizzly bears in violation of the Endangered Species Act. Although we reject Wallen's argument that he was entitled to a jury trial, we hold the magistrate judge, who served as the trier of fact at trial, misconceived the self-defense element of the offense, and that error was not harmless. We hold the "good faith belief" defense for a prosecution under 16 U.S.C. § 1540 is governed by a subjective, rather than an objective, standard, and is satisfied when a defendant actually, even if unreasonably, believes his actions are necessary to protect himself or others from perceived danger from a grizzly bear. Because the district court applied an objective standard, we vacate Wallen's conviction and remand for further proceedings consistent with this opinion.

**I.**

Wallen lives in Ferndale, Montana, a place aptly described as "bear country." In the spring of 2014, local residents reported the presence of three grizzly bear cubs to

Tim Manley, a grizzly bear management specialist with Montana Fish, Wildlife & Parks (FWP). These bears were "food conditioned" and "habituated," meaning they wanted unnatural foods like chicken feed and were not afraid of approaching humans to get them. Residents observed the bears frolicking in backyards, eating grass and "just being bears." Others reported the bears for ransacking chicken coops. None reported aggressive behavior toward humans.

On the morning of May 27, 2014, Wallen discovered a number of dead chickens in his yard. The culprits had rammed through the fence to his chicken coop and killed two-thirds of his chickens. One perpetrator left behind a paw print that Wallen concluded belonged to a bear.

Neither Wallen nor his wife, Alison, called Manley or any other authority after discovering the dead chickens and the paw print. Instead, they went to work and returned home that afternoon.

Later that evening, Wallen and Alison watched their two boys (ages 8 and 11), their 16-year-old daughter (A.B.) and A.B.'s boyfriend play outside. The three bears then returned, heading for the chicken coop. The chickens scattered and the bears gave chase, running within 100 feet of where Wallen's daughter stood. A.B. screamed and ran into the house through a glass back door as Wallen got in his truck and chased the bears away. Meanwhile, Alison called Manley's cell phone and left a message telling him the grizzlies had come for their chickens twice and that her husband was trying to chase them away with the truck. She asked for advice as to what she and her husband could do about the bears.

The bears returned for a second time 10 to 15 minutes later. Again, the chickens ran, the bears gave chase and Wallen frightened them away with his truck.

After Wallen chased the bears, they entered the property of the Wallens' neighbor, Tom Clark. Clark videotaped them milling about and crossing a nearby highway. At no point did the bears behave aggressively toward him. He stopped recording at 9:14 p.m. Shortly thereafter, he heard shots fired, followed by a roar from the direction of Wallen's property. As later became clear, the sounds Clark heard were Wallen shooting and killing the three grizzlies.

Wallen has never denied shooting the three bears with an "old, rusty .22 caliber rifle" after they returned to his property for a third time that night. He has also never denied causing the bears' deaths. He has, however, offered different accounts of the circumstances surrounding the shootings.

He gave one story on the night of the shooting, when investigators discovered the remains of one of the bears. When FWP investigator Charles Bartos interviewed Wallen that evening, Wallen told Bartos he had found a single bear eating chickens in his coop and fired two shots to frighten it away. Wallen told Bartos the bear was walking away as he fired. He did not mention shooting the other two bears. Bartos later performed a necropsy on the bear and found two bullet holes "in the left hind quarter entering towards the stomach area," consistent with the bear having been shot from behind.

The next day, after remains of a second bear were discovered, Wallen gave a different account, now admitting he had shot at all three bears. He told Bartos he had fired at the other bears as they passed through his property before shooting the last bear while it ate his chickens.

The following day, United States Fish & Wildlife Service Agent David Lakes interviewed Wallen at his home, and Wallen once again altered his story. He said he had been picking up dead chickens near his truck when two bears crossed the highway in a "mad dash" toward him, while his family was gathered around the basketball court outside. He said he grabbed his gun from inside the truck and fired at the bears. He could not recall where his family went immediately after he fired the shots. Within minutes, however, Wallen said a third bear came onto his property and started chasing the chickens. He told Lakes he shot at this bear twice, while his family was outside and "right behind [him]." Wallen also took Lakes outside and showed him where he was when he shot the bears. Lakes paced off the area and determined Wallen shot all three bears from a distance of approximately 40 yards.

Remains of the third bear were discovered around a week later.

Wallen was federally charged for killing all three bears in violation of the Endangered Species Act and was tried by a magistrate judge, over Wallen's objection and request for a jury trial.

At trial, Wallen asserted he shot the bears in self-defense, to protect himself and his family. He said he was surrounded by live chickens when two bears approached from a distance of approximately 15 feet. He testified he was carrying his gun on his person. He said he fired two shots from his shoulder at the bears while backpedaling and remained outside to clean up dead chickens. Wallen said he was the only person outside when he shot the third bear. The bear ran toward him and was a mere 28 feet away when he fired a first shot at it. When the bear kept coming toward him, he

fired a second time from a distance of 33 feet. He said he was frightened.

Wallen's daughter and wife also testified at trial. A.B. said she ran in the house when the first two bears were approximately 15 feet away from Wallen and did not hear a shot until a minute later. She watched from the house as a third bear came into the yard while her father was standing in the driveway. She said Wallen fired a first shot at the third bear when it was 30 to 40 feet away. The last bear "started running around all over the place" after the first shot and "jumped up" and ran away after the second shot. She said everyone except Wallen was inside the home when the third bear was shot. Alison testified she never saw the bears charge at Wallen or the children. She and the children had gone inside before the shooting began.

After the close of evidence, Magistrate Judge Jeremiah Lynch, as factfinder, found the "discrepancies" in Wallen's testimony "compel[led]" the conclusion that Wallen's claim of self-defense was "simply not credible." After concluding the government proved Wallen's belief that he acted in self-defense was *objectively unreasonable*, the magistrate judge found Wallen guilty.

The judge sentenced Wallen to three years' probation, the first 60 days of which were to be served at a pre-release center, and ordered Wallen to pay $15,000 in restitution. After the district court affirmed Wallen's conviction, Wallen appealed to this court. The magistrate judge stayed Wallen's sentence pending appeal.

Wallen makes three arguments on appeal: (1) he should have been tried by a jury; (2) the magistrate judge did not correctly identify the elements of his offense, and that error was not harmless; and (3) the case should be remanded for a

trial by jury in the interest of justice. We address these issues in turn.

## II.

We begin by addressing Wallen's contention that his offense was serious, rather than petty, entitling him to a trial by jury.

"It is well established that the Sixth Amendment, like the common law, reserves th[e] jury trial right for prosecutions of serious offenses, and that 'there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision.'" *Lewis v. United States*, 518 U.S. 322, 325 (1996) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 159 (1968)). "[T]o determine whether an offense is petty, we consider the maximum penalty attached to the offense." *Id.* at 326. "An offense carrying a maximum prison term of six months or less is presumed petty, unless the legislature has authorized additional statutory penalties so severe as to indicate that the legislature considered the offense serious." *Id.*

Here, Wallen was convicted for "taking" three grizzly bears in violation of 16 U.S.C. §§ 1538(a)(1)(G) and 1540(b)(1) and 50 C.F.R. § 17.40(b)(1)(i)(A).[1] This is a presumptively petty crime because the maximum possible length of incarceration is six months. *See Lewis*, 518 U.S. at 326–27; 16 U.S.C. § 1540(b)(1). This presumption can be overcome by showing the "additional statutory penalties" associated with taking a grizzly bear are "so severe as to

---

[1] "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

indicate that the legislature considered the offense serious." *Lewis*, 518 U.S. at 326. In *United States v. Clavette*, 135 F.3d 1308, 1310 (9th Cir. 1998), we considered the additional statutory penalties authorized by § 1540 and concluded they did not transform taking a grizzly bear into a serious crime.

Wallen argues *Clavette* is "not dispositive" for three reasons: (A) the five-year term of probation authorized for a conviction under § 1540[2] is an "additional statutory penalt[y] so severe as to indicate that the legislature considered the offense serious"; (B) the $15,000 in restitution he was ordered to pay likewise amounts to a sufficiently "severe" "additional statutory penalt[y]"; and (C) his crime is "serious" because it does not fall within the class of "petty" offenses defined by 18 U.S.C. § 19. We reject these arguments because they are foreclosed by *Clavette*. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc). But even if they were not foreclosed, we would reject them as unpersuasive.

## A.

First, Wallen's argument that his exposure to a five-year term of probation rendered his crime serious lacks merit even if *Clavette* were not controlling. Exposure to lengthy probation does not make a crime serious. Every federal misdemeanor offense carries a maximum five-year term of probation. *See* 18 U.S.C. § 3561(c)(2). If, as Wallen contends, exposure to lengthy probation made an offense serious, only crimes classified as infractions – which carry a maximum imprisonment term of *five days* – would be petty. *See id.* §§ 3559(a)(9), 3561(c)(3). Limiting "petty" offenses

---

[2] *See* 18 U.S.C. § 3561(c)(2).

to infractions is foreclosed by precedent. *See, e.g.*, *Lewis*, 518 U.S. at 324, 330. Wallen's argument therefore fails.

**B.**

Second, even if we were not bound by *Clavette*, we would reject Wallen's contention that the amount of restitution he was ordered to pay – $15,000 ($5,000 for each bear) – converts his offense into a serious one, entitling him to a jury trial. As we explained in *United States v. Ballek*, 170 F.3d 871, 876 (9th Cir. 1999), "the possibility that the district court will order restitution, in addition to a six-month maximum sentence, does not turn an otherwise petty offense into a serious one, no matter how large the sum involved." Restitution "merely reinforces [a defendant's] existing moral and legal duty to pay a just debt." *Id.* (rejecting the argument that an order to pay $56,916.71 in restitution made a crime serious). *Clavette* held a defendant was not entitled to a jury trial even though he was ordered to pay restitution of $6,250 for killing a single grizzly bear, in addition to a $2,000 fine. *See Clavette*, 135 F.3d at 1309–10. The same principle applies here.

**C.**

Finally, Wallen's contention that 18 U.S.C. § 19 makes his crime serious, entitling him to a jury trial, is equally unpersuasive. Although Wallen contends otherwise, there is no "Section 19 test" to determine whether a defendant is entitled to a jury trial. Section 19 says the term "petty offense" as used in title 18 includes Class B misdemeanors for which the maximum fine is no greater than $5,000. *See* 18 U.S.C. §§ 19, 3571(b)(6). Wallen's offense is a Class B misdemeanor, *see* 18 U.S.C. § 3559(a)(7), but the maximum possible fine is $25,000, *see* 16 U.S.C. § 1540(b)(1). Accordingly, Wallen's offense is not a "petty offense" as

defined by § 19. But this does not mean, as he contends, that he is entitled to a jury trial.

Wallen's reliance on § 19 is misplaced because the federal statutory definition of "petty offense" under § 19 holds no "talismanic significance" when determining a defendant's right to a jury trial. *Muniz v. Hoffman*, 422 U.S. 454, 477 (1975) (considering an earlier version of § 19, previously codified at 18 U.S.C. § 1, which set the maximum fine for a "petty offense" at $500) ("It is one thing to hold that deprivation of an individual's liberty beyond a six-month term should not be imposed without the protections of a jury trial, but it is quite another to suggest that, regardless of the circumstances, a jury is required where any fine greater than $500 is contemplated.").

This conclusion is evidenced, in part, by use of the term "petty offense," as defined by § 19, in 18 U.S.C. § 3401, which outlines the jurisdiction of magistrate judges over criminal misdemeanor trials. Those charged with a misdemeanor "other than a petty offense" may elect to be tried before a district judge instead of a magistrate judge. *See id.* § 3401(b). Significantly, the magistrate judge must explain to a defendant charged with a non-petty misdemeanor "that he has a right to trial, judgment, and sentencing by a district judge and that he *may* have a right to trial by jury before a district judge or magistrate judge." *Id.* (emphasis added). As evidenced by use of the word "may" in § 3401(b), Congress considered a circumstance in which a defendant is charged with a non-petty misdemeanor but *not* entitled to a jury trial. *See id.*

As we concluded in *Clavette*, "the addition of a $25,000 fine to a prison term of not more than six months does not reflect a clear Congressional determination that violation of an Interior Department regulation pertaining to endangered

or threatened species is a serious offense" notwithstanding "the Congressional definition of 'petty offenses.'" 135 F.3d at 1310. Wallen was not entitled to a jury trial.

## III.

### A.

We next address Wallen's argument that the district court misconceived the self-defense element of his offense. To convict a defendant for knowingly taking a grizzly bear, the government must prove beyond a reasonable doubt that: (1) the defendant knowingly killed a bear; (2) the bear was a grizzly; (3) the defendant did not have permission to kill the bear; and (4) the defendant did not act in self-defense or in the defense of others. *See Clavette*, 135 F.3d at 1311. The last element, which is the only element at issue here, derives from a provision added to the Endangered Species Act in 1978. *See* Endangered Species Act Amendments of 1978, Pub. L. No. 95-632, § 8, 92 Stat. 3751, 3762 (1978). This provision states:

> Notwithstanding any other provision of this chapter, it shall be a defense to prosecution under this subsection if the defendant committed the offense based on a *good faith belief* that he was acting to protect himself or herself, a member of his or her family, or any other individual, from bodily harm from any endangered or threatened species.

16 U.S.C. § 1540(b)(3) (emphasis added); *see also* 16 U.S.C. § 1540(a)(3) (preventing the imposition of civil penalties for the same reason); 50 C.F.R. § 17.40(b)(1)(i)(B) ("Grizzly bears may be taken in self-defense or in defense of others . . . ."). Here, the parties dispute whether the "good faith

belief" standard requires an objectively reasonable belief, as the government argues, or requires only a subjective belief in the need to protect oneself or others, as Wallen maintains. The magistrate judge and district court applied an objective test. We conclude that was error.

Congress added the good faith belief defense in 1978, after an elderly couple was prosecuted for killing a grizzly bear that had threatened them. *See* 124 Cong. Rec. 21,584 (1978). But neither the statute nor the regulations say whether the requisite "good faith belief" must be objectively reasonable, *see* 16 U.S.C. § 1540(b)(3); 50 C.F.R. § 17.40(b)(1)(i)(B), and we are unaware of any binding case law addressing that question. We now hold that a subjective good faith belief suffices to establish self-defense under this statute.

In adopting an objective reasonableness standard, the magistrate judge relied on *United States v. Keiser*, 57 F.3d 847, 851–52 (9th Cir. 1995), which applied the Ninth Circuit's model jury instruction for self-defense to a federal assault charge under 18 U.S.C. § 113 (1992). *See United States v. Wallen*, No. 14-45, 2015 WL 1467446, at *6 (D. Mont. Mar. 30, 2015).[3] Because the self-defense provision in § 113 used different statutory language than the

---

[3] The magistrate judge, at the government's urging, may have relied on *Clavette* having cited *Keiser*. If so, that reliance was misplaced. *Clavette* noted the burden shifts to the government to disprove self-defense once a defendant introduces evidence supporting the defense, citing a footnote in *Keiser*. *See Clavette*, 135 F.3d at 1311 (citing *Keiser*, 57 F.3d at 851 n.4). *Clavette* did not address the objective reasonableness standard found in *Keiser*, however. *See id.* at 1311–12.

self-defense provision at issue here, we conclude the magistrate judge's reliance on *Keiser* was misplaced.

The self-defense provision in § 113 required the government to prove the offense was committed "without just cause or excuse."   18 U.S.C. § 113(c) (1992).   We upheld a jury instruction making the defense available if the defendant "*reasonably* believes that [the force] is necessary" to protect "against the immediate use of unlawful force." *Keiser*, 57 F.3d at 851 (emphasis added).[4]

Were the language of the self-defense provision at issue here similar to ordinary self-defense provisions, we would agree with the magistrate judge that *Keiser* would stand as persuasive precedent.   *Keiser* tracks the traditional understanding of self-defense against aggressors.   *See* 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.4 (2d ed. Oct. 2016) [hereinafter LaFave] ("One who is not the aggressor in an encounter is justified in using a reasonable amount of force against his adversary when he *reasonably* believes (a) that he is in immediate danger of unlawful bodily harm from his adversary and (b) that the use of such force is necessary to avoid this danger.  It is never reasonable to use deadly force against his nondeadly attack." (emphasis added)).   Many modern criminal codes explicitly require a reasonable belief that physical force against another person

---

[4] The instruction also said a defendant "must use no more force than appears reasonably necessary in the circumstances," and it said deadly force could not be used unless deadly force was threatened.  *Keiser*, 57 F.3d at 851.

is necessary before its use may be considered justified. *See id.*[5]

But 16 U.S.C. § 1540(b)(3) is not a standard self-defense provision, and it does not use standard self-defense language. In contrast to the former version of § 113 at issue in *Keiser*, § 1540(b)(3) provides a defense to those who have a "good faith belief" in the need to act. 16 U.S.C. § 1540(b)(3).

Although "good faith" requirements may be construed in context as imposing objective standards, statutes referring to a "good faith belief" ordinarily are construed as calling for a subjective inquiry. Black's Law Dictionary defines "good faith" as a state of mind consisting in "honesty in belief or purpose" or "absence of intent to defraud or to seek unconscionable advantage." *Good Faith*, Black's Law

---

[5] *See also, e.g.*, Ala. Code § 13A-3-23(a) (authorizing force against what a person "reasonably believes to be the use or imminent use of unlawful physical force by that other person"); Ariz. Rev. Stat. § 13-404(A) (same); Ark. Code Ann. § 5-2-606(a)(1) (same); Colo. Rev. Stat. § 18-1-704(1) (same); Conn. Gen. Stat. § 53a-19(a) (same); Fla. Stat. § 776.012(1) (same); Ga. Code Ann. § 16-3-21(a) (same); 720 Ill. Comp. Stat. 5/7-1(a) (same); Ind. Code § 35-41-3-2(c) (same); Iowa Code § 704.1(1) (same); Kan. Stat. Ann. § 21-5222(a) (same); La. Stat. Ann. § 14:19(A)(1)(b)(i) (same); Me. Rev. Stat. Ann. tit. 17-A, § 108(1) (same); Minn. Stat. § 609.06(3) (same); Mo. Ann. Stat. § 563.031(1) (same); Mont. Code Ann. § 45-3-102 (same); N.H. Rev. Stat. Ann. § 627:4 (same); N.J. Stat. Ann. § 2C:3-4 (same); N.Y. Penal Law § 35.15 (1) (same); Or. Rev. Stat. § 161.209 (same); S.D. Codified Laws § 22-16-35 (same); Tenn. Code Ann. § 39-11-611(b) (same); Tex. Penal Code Ann. § 9.31(a) (same); Utah Code Ann. § 76-2-402(1) (same); Wash. Rev. Code § 9A.16.050 (same); Wis. Stat. § 939.48 (1) (same). *But see* Model Penal Code § 3.04 (providing that the use of force is justified if the "actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion").

Dictionary (10th ed. 2014). A good faith belief defense therefore ordinarily depends on a defendant's subjective state of mind, and the defense is not automatically precluded by evidence that the state of mind was objectively unreasonable. *See, e.g.*, *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 464 (D.C. Cir. 1976) (interpreting a "good faith" defense in 29 U.S.C. § 260 as "'an honest intention to ascertain what the . . . Act requires and to act in accordance with it.' That necessitates a subjective inquiry." (alteration in original) (footnote omitted) (quoting *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 93 (2d Cir. 1953))), *overruled on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134–35 (1988); *see also, e.g.*, *Cheek v. United States*, 498 U.S. 192, 202–03 (1991) (holding a "good-faith belief" that a defendant was not violating the tax laws, regardless of whether the claimed belief or misunderstanding was objectively unreasonable, prevented conviction under a willfulness standard); *Rossi v. Motion Picture Ass'n of Am.*, 391 F.3d 1000, 1005 (9th Cir. 2004) ("A copyright owner cannot be liable [under 17 U.S.C. § 512(c)(3)(A)(v), which enables copyright owners to act on a 'good faith belief,'] simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake."); *United States v. Powell*, 955 F.2d 1206, 1212 (9th Cir. 1991) (holding district court erred by instructing jury defendants must have held an objectively reasonable belief to have a good faith defense to the charge of willfully failing to file a federal tax return) ("The vice of the jury instruction given is that it did not make clear that the defendant must demonstrate only that a subjective good faith belief is held and not that the belief must also be found to be objectively reasonable.").

"It is a well-established rule of construction that 'where Congress uses terms that have accumulated settled meaning

under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'" *Neder v. United States*, 527 U.S. 1, 21 (1999) (alterations omitted) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992)). As we have said, "the objective reasonableness standard is distinct from the subjective good faith standard," and "Congress understands this distinction." *Rossi*, 391 F.3d at 1004 (holding that "courts interpreting . . . federal statutes have traditionally interpreted 'good faith' to encompass a subjective standard"). Holding the government to "a lesser 'objective reasonableness' standard would be inconsistent with Congress's apparent intent" to exempt from prosecution those defendants who harbor a subjective belief that force used against grizzly bears is necessary. *See id.* at 1005. Under *Rossi*, when Congress enacts a good faith requirement without expressly incorporating an objective standard of reasonableness, it "indicates an intent to adhere to the subjective standard traditionally associated with a good faith requirement." *Id.* at 1004.

During oral argument, the government argued we should interpret "good faith belief" under § 1540(b)(3) as having an objective component, similar to the standards we adopted in *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1180–81 (9th Cir. 2013) (applying a good faith reliance defense under the Stored Communications Act, 18 U.S.C. § 2707(e)), and *Jacobson v. Rose*, 592 F.2d 515, 523 (9th Cir. 1978) (applying a good faith reliance defense under title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2520(d),

pertaining to the interception of electronic communications).**6**

We do not find the government's argument persuasive. *Sams* viewed the privacy protections established by the Stored Communications Act (SCA) through the lens of the Fourth Amendment. We noted that "[t]he SCA was enacted because the advent of the Internet presented a host of potential privacy breaches that the Fourth Amendment does not address." *Sams*, 713 F.3d at 1179 (quoting *Quon v. Arch Wireless Operating Co.*, 529 F.3d 892, 900 (9th Cir. 2008)). We also observed that, "[t]o address these potential privacy breaches, the SCA 'creates a set of Fourth Amendment-like privacy protections by statute, regulating the relationship

---

**6** Section 2707(e) provides a good faith reliance defense to those who comply with requests from law enforcement for information stored electronically. Under § 2707(e):

> A good faith reliance on –
>
> (1) a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization (including a request of a governmental entity under section 2703(f) of this title);
>
> (2) a request of an investigative or law enforcement officer under section 2518(7) of this title; or
>
> (3) a good faith determination that section 2511(3) of this title permitted the conduct complained of;
>
> is a complete defense to any civil or criminal action brought under this chapter or any other law.

18 U.S.C. § 2707(e). Section 2520(d) uses similar language, and the current language is similar to that used by the statute at the time we decided *Jacobson*.

between government investigators and service providers in possession of users' private information.'" *Id.* (quoting Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1212 (2004)). And in applying § 2707(e), we expressly relied on Fourth Amendment case law, citing *United States v. Crews*, 502 F.3d 1130, 1136–38 (9th Cir. 2007), where we applied the Fourth Amendment's exception to the exclusionary rule for a search conducted in good faith reliance upon an objectively reasonable search warrant. *See id.* at 1181.

Given the SCA's relationship to the Fourth Amendment, it is unsurprising that *Sams* adopted an objective standard of good faith reliance. That standard comports with the Fourth Amendment generally. *See United States v. Leon*, 468 U.S. 897, 922 (1984) (holding the exclusionary rule does not apply to evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant); *Terry v. Ohio*, 392 U.S. 1, 22 (1968) ("If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police." (quoting *Beck v. Ohio*, 379 U.S. 89, 97 (1964))); *see also Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (reiterating that "the ultimate touchstone of the Fourth Amendment is 'reasonableness'" (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006))). Just as *Leon* requires reasonable reliance on a warrant, the SCA requires reasonable reliance on a governmental order or request.

Similarly, *Jacobson* relied on 42 U.S.C. § 1983 cases when it interpreted the good faith reliance defense under § 2520(d). *See Jacobson*, 592 F.2d at 523. In § 1983 cases, a defendant could shield himself from liability if he "held a

subjective belief which was objectively reasonable that he was acting legally." *Id*. *Jacobson* analogized the good faith defense under § 1983 to the good faith defense under § 2520, and therefore applied the § 1983 "formula to the § 2520 context." *Id*.[7]

By contrast, the good faith belief defense under § 1540(b)(3) is not a reliance defense, and it is not related to either the Fourth Amendment or § 1983. We therefore construe § 1540(b)(3) in accordance with the general principle that a good faith belief defense ordinarily depends on a defendant's subjective state of mind rather than the objective reasonableness of the defendant's belief, *see Rossi*, 391 F.3d at 1004, not on case law construing the SCA or title III. For this reason, the government's reliance on *Sams* and *Jacobson* is unpersuasive.[8]

We emphasize that, although the ultimate question is whether a defendant held a subjective good faith belief, the objective reasonableness (or unreasonableness) of a claimed

---

[7] In *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the Supreme Court adopted a purely objective qualified immunity defense for public officials acting in their official capacities in § 1983 actions. Today, the good faith defense under § 1983 that we looked to in *Jacobson* is most often invoked in § 1983 actions involving private defendants who cannot avail themselves of the qualified immunity defense. *See, e.g.*, *Clement v. City of Glendale*, 518 F.3d 1090, 1096–97 (9th Cir. 2008).

[8] The government also relies on *Shuler v. Babbitt*, 49 F. Supp. 2d 1165 (D. Mont. 1998). Interpreting § 1540(a)(3) – the civil defense for taking a grizzly bear – *Shuler* concluded "a person must be in imminent or immediate danger of bodily harm in order to avail himself of a claim of self-defense" and cannot benefit from the defense if he or she "provoked the conflict." *Id*. at 1169. *Shuler* cited no authority for this conclusion other than the decision of the "Ad Hoc Board of Appeals, Department of the Interior" in Shuler's case. *Id*. at 1168.

belief bears directly on whether that belief was held in good faith. We and the Supreme Court have already said as much. In *Cheek*, 498 U.S. at 203–04, when assessing the petitioner's claimed belief that he was in compliance with the tax code, the Supreme Court explained that "the more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury will consider them to be nothing more than simple disagreement with known legal duties imposed by the tax laws." Similarly, in *Powell*, 955 F.2d at 1212, we held the jury was "not precluded from considering the reasonableness of the interpretation of the law in weighing the credibility of the claim that the [defendants] subjectively believed that the law did not require that they file income tax returns." We have also recognized this principle in maritime cases that turn on "whether the seaman[] in good faith believed himself fit for duty when he signed aboard for duty." *Burkert v. Weyerhaeuser S.S. Co.*, 350 F.2d 826, 831 (9th Cir. 1965). In *Burkert*, the "crucial fact issue before the court was whether or not there existed reasonable grounds to support [a seaman's] belief that he was fit for duty. The absence of such reasonable grounds would support a finding that [he] did not believe, in good faith, that he was fit for duty." *Id.*

Under the Endangered Species Act, the reasonableness of a belief that an endangered animal posed a threat is likewise strong evidence of whether the defendant actually held that belief in good faith. Consider the example of a person who goes to the zoo, shoots all the endangered animals and then claims he believed the animals otherwise would have escaped and attacked him. The unreasonableness of the asserted belief should matter in a subsequent prosecution under the Endangered Species Act, as that unreasonableness casts significant doubt on the sincerity of the claimed belief.

In sum, we hold the "good faith belief" defense under § 1540(b)(3) is available to defendants who, in good faith, subjectively believe they or others are in danger. A factfinder "is not precluded from considering the reasonableness" of this belief "in weighing the credibility of the claim," but that factfinder "may not substitute its own determination of objective reasonableness . . . [for] what the defendant subjectively believed." *Powell*, 955 F.2d at 1212. This means that traditional aspects of a self-defense claim – such as the immediacy of the threat, whether the defendant provoked the conflict or the amount of force used, *see* LaFave, *supra*, § 10:4(b), (d), (e) – may be considered for the purpose of determining whether a claimed belief was held in good faith. The standard is subjective, but the objective reasonableness of the defendant's claimed belief is relevant to the factfinder's assessment of the sincerity of that claim. Because the magistrate judge did not apply a subjective good faith standard, he misconceived an element of Wallen's offense. We turn to whether that error was harmless.

## B.

The "basic misconception of an essential element of the crime charged" generally "compels reversal of the conviction," whether handed down by a judge or jury. *Wilson v. United States*, 250 F.2d 312, 324 (9th Cir. 1958). Nevertheless, this constitutional error is not "structural," requiring automatic reversal, "but instead is subject to harmless error analysis." *United States v. Conti*, 804 F.3d 977, 980 (9th Cir. 2015); *see also Neder*, 527 U.S. at 15. We will affirm a conviction when the error is harmless beyond a reasonable doubt. *See Conti*, 804 F.3d at 980; *see also United States v. Argueta-Rosales*, 819 F.3d 1149, 1156 (9th Cir. 2016) ("When a district court in a bench trial has made

a legal error regarding the elements of an offense, the error is reviewed using the same harmless error standard that would apply to an erroneous jury instruction."); *United States v. Liu*, 731 F.3d 982, 987, 992 (9th Cir. 2013) ("A district court's omission or misstatement of an element of an offense in the jury instructions is subject to harmless error review [and] 'is harmless only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" (quoting *United States v. Munguia*, 704 F.3d 596, 603–04 (9th Cir. 2012))).

Here, the magistrate judge rejected Wallen's claim of self-defense based on the objective unreasonableness of Wallen's purported fear for himself and his family:

> The Court concludes the government satisfied this burden. As set forth above, Wallen gave materially conflicting versions of events and was not entirely forthcoming when he spoke [to] Bartos on the night in question. *The Court concludes based on the record as a whole, and the substantial inconsistencies in Wallen's stories and lack of credibility, that the government met its burden of proving beyond a reasonable doubt that Wallen did not have an objectively reasonable good faith belief that he was acting to protect himself or his family from bodily injury when he shot at the three grizzly bears.*

(Emphasis added.) The error therefore was not harmless.

In arguing otherwise, the government relies on *United States v. Doe*, 136 F.3d 631, 636–37 (9th Cir. 1998), but *Doe* is inapposite. There, the district court applied a *higher*

standard of proof than was required.  *See id.*  Because the correct *lower* standard was "encompassed within the higher," the error was harmless.  *Id.* at 637.  Here, by contrast, the magistrate judge held the government to a *lower* standard of proof than was required.  *Doe* does not apply here.

Next, relying on our sufficiency of the evidence analysis in *Clavette*, the government argues the magistrate judge would have rejected Wallen's claim of self-defense even if the court had applied only a subjective good faith belief test because the court found Wallen not credible.  *See* 135 F.3d at 1311–12.  But the sufficiency of the evidence analysis asks whether "any reasonable person could have found each of the essential elements of the offense charged beyond a reasonable doubt."  *Id.* at 1311.  Here, the question is the opposite, *i.e.*, whether applying the correct standard, it is clear beyond a reasonable doubt that the factfinder would have come to the same conclusion.  *See United States v. Montoya-Gaxiola*, 796 F.3d 1118, 1124–25 (9th Cir. 2015). The government's reliance on *Clavette* therefore fails as well.

Applying the correct standard, we conclude a reasonable factfinder *could* find the government failed to establish beyond a reasonable doubt that Wallen lacked a subjective belief he was in danger.  We acknowledge the discrepancies in the stories Wallen told in the aftermath of the killings.  But regardless of whether the bears were eating chickens; whether they were 40 yards or just 15 feet away; whether Wallen grabbed his gun from the pickup truck or carried it on his person; whether his family was inside or outside; whether Wallen was surrounded by dead, live or no chickens at all; whether the last bear ran toward or away from him; or whether he immediately confessed to killing three bears as

opposed to one, a reasonable factfinder could find Wallen acted to protect himself from what he subjectively perceived as danger. To be sure, given Wallen's credibility issues, a factfinder might not believe he was actually fearful. But that question is for the factfinder to decide. Accordingly, we cannot say the magistrate judge's misconception of an element of the offense was harmless.

## IV.

The final issue is whether Wallen is entitled to a jury trial on remand. Wallen argues that, even if the Constitution does not guarantee his right to a jury trial, he is entitled to one because, if he is again tried by a judge, that judge would have access to his record of conviction. He contends this information would bias the trier of fact, denying him a fair trial.

We disagree. An accused is not entitled to a trial by jury merely because a judge, sitting as a trier of fact, may have knowledge of the defendant's record of conviction. *See Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.").

## V.

We vacate Wallen's conviction and sentence and remand to the district court for further proceedings consistent with this opinion. On remand, the magistrate judge must decide whether Wallen held a subjective "good faith belief that he was acting to protect himself [or] a member of his . . . family

. . . from bodily harm" from the grizzly bears.  16 U.S.C. § 1540(b)(3).   In assessing the credibility of Wallen's claimed belief that shooting the bears was necessary, the magistrate judge may consider any evidence that it would have been unreasonable to believe the bears posed a danger to Wallen or his family.

**VACATED AND REMANDED.**